DUREN, ADMX., *v.* SUBURBAN COMMUNITY HOSPITAL.

(No. 55142—Decided September 5, 1985.)

Court of Common Pleas of Cuyahoga County.

*Charles I. Kampinski* and *Robert L. White,* for plaintiff.

*Marshall I. Nurenberg,* for defendant Lissauer.

*Patrick J. Murphy* and *Dale E. Markworth,* for defendant Suburban Community Hospital.

JAMES J. McMONAGLE, J. This medical malpractice case resulted in a plaintiff's verdict against the defendant hospital in the amount of $2,500,000 for wrongful death, $1,000,000 for pain and suffering on the survival action and $2,554 in funeral expenses.

The defendant now has moved for a new trial and/or remittitur on the following grounds:

1. The judgment entered on the survivorship claim is contrary to R.C. 2307.43. (Civ. R. 59[A][7].)

2. The judgments entered on both the survivorship claim and the wrongful death claim are excessive, appearing to have been given under the influence of passion or prejudice. (Civ. R. 59[A][4].)

3. The judgments entered on both the survivorship claim and the wrongful death claim are excessive and the amount of same is not supported by the weight of the evidence. (Civ. R. 59[A][6].)

4. The judgment entered for plaintiff on the wrongful death claim is not supported by the weight of the evidence in that plaintiff did not prove that with proper medical treatment, the decedent probably would have survived. Further, the trial court erred in failing to instruct the jury that plaintiff had the burden of proving that with proper medical treatment, decedent probably would have survived. (Civ. R. 59[A][9].)

5. The trial court erred in failing to instruct the jury on the issue of comparative negligence insofar as it relates to the negligence of the decedent in not following proper medical advice and such negligence contributing to both his conscious pain and suffering and death. (Civ. R. 59[A][9].)

The plaintiff has asked the court to award prejudgment interest pursuant to R.C. 1343.03(C) and to tax certain expenses as costs.

All post-trial motions have been fully briefed, evidence has been taken and arguments have been presented.

I

Facts

The plaintiff's decedent-husband on the date of his death was a forty-seven-year-old father of two who was employed by the city of Cleveland as a mechanic, earning approximately $25,000 per year. His wife, the plaintiff-administratrix herein, because of a birth defect, was uniquely dependent upon her husband to assist her in her daily routine, i.e., drive, shop, clean house, etc. The decedent was a large man who at the time of his death weighed two hundred ninety-four pounds, and had previous health problems, including diabetes and pancreatitis (an extremely painful inflammation of the pancreas).

On February 17, 1982, Mr. Duren became ill with complaints of stomach pain, nausea and vomiting. In the early afternoon of that day, he was admitted to the defendant Suburban Community Hospital. The admitting physician, who was originally named as a defendant but in whose favor the jury later found, ordered that a number of tests be done immediately ("stat" test), including blood tests, calcium tests and an electrocardiogram. The results of the calcium tests were not available until after Mr. Duren's death, and the EKG was not done.

The admitting physician also had ordered urine fractionals four times a day to be performed to determine the sugar level in the urine and thereafter left orders that the hospital employees were to administer specified doses of insulin depending upon the urine glucose level. Only one sugar-level test was performed and that was at 9:00 p.m. on the date of the decedent's admission, and this indicated the decedent's sugar level was at the highest level able to be recorded on the testing device that was being used. The evidence, including the testimony and the hospital charts, indicated that no insulin was administered and that the decedent's vital signs were rapidly deteriorating to a point where at 10:00 p.m., the hospital charts indicated that the decedent's pulse was 144 and his temperature was 102° F., an extremely elevated and abnormal status which would require the R.N. on duty to notify a physician, but none was called.

At the change of shift at midnight, the same R.N. on duty failed to notify the R.N. on the following shift of Mr. Duren's critical condition. During the early morning hours of February 18, 1982, Mr. Duren was virtually ignored by the hospital, even though he was in obvious pain. No vitals were taken. No tests were given. No medication was dispensed until approximately 5:00 a.m. when Mr. Duren was thrashing about in his bed and accidentally removed his I.V. At that time, the house doctor, who was physically close by, was called but he did not appear at Mr. Duren's bedside until approximately two hours later

when, for all practical purposes, the decedent was within minutes of death.

He was pronounced dead at 7:17 a.m. The only contact with the admitting physician was subsequent to Mr. Duren's death, to inform him of Mr. Duren's demise.

The medical records introduced into evidence showed that the 6:00 a.m. entries were pure fabrication and further, the testimony demonstrated that the R.N. on duty after midnight did not write the notes even though she signed them. An internal investigation of the circumstances surrounding Mr. Duren's death was conducted by the defendant hospital, but no definite conclusions were reached.

There was no autopsy, but the Certificate of Death said death was caused by (a) cardio-respiratory arrest; (b) acute pancreatitis; and (c) Type IV hyperlipidemia.

The decedent's administratrix filed suit on February 14, 1983. Pursuant to the compulsory arbitration scheme provided in R.C. 2711.21, the plaintiff was awarded $420,000 against the defendant hospital solely. A dissenting arbitrator found damages of $1,250,000 also against the hospital only. Both the plaintiff and defendant hospital filed notices of non-acceptance of the arbitration award and a jury trial resulted in the aforementioned verdicts.

II
Constitutionality of R.C. 2307.43

Defendant contends that the survivorship jury verdict of $1,000,000 is contrary to R.C. 2307.43, which reads:

"In no event shall an amount recovered for general damages in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, not involving death exceed the sum of two hundred thousand dollars."

Plaintiff claims that the above section is inapplicable because this case involves a death, and further that this code provision, if applicable, is violative of certain provisions of both the Ohio and federal Constitutions.

R.C. 2307.43, by its unambiguous terms, does not apply to the jury's verdict on the plaintiff's wrongful death claim. This section does, however, apply to the survivorship action.

Courts located in Ohio are divided as to the constitutionality of this section. Case authority declaring this legislation unconstitutional are: *Graley* v. *Satayatham* (C.P. 1976), 74 O.O. 2d 316; *Simon* v. *St. Elizabeth Medical Center* (C.P. 1976), 3 O.O. 3d 164; *Nervo* v. *Pritchard* (June 10, 1977), Stark App. No. CA-6560, unreported. Cases upholding the constitutionality of the act are: *Keeton* v. *Mansfield Obstetrics & Gynecology Assoc., Inc.* (N.D. Ohio 1981), Civil No. 80-1573A, unreported; and *Dowdy* v. *Lee* (Dec. 27, 1983), Stark App. No. CA-6249, unreported.

Courts throughout the country are likewise split as to the constitutionality of a limitation on medical malpractice damages. The following cases have not approved damage limitations: *Wright* v. *Central DuPage Hospital Assn.* (1976), 63 Ill. 2d 313, 347 N.E. 2d 736; *Carson* v. *Maurer* (1980), 120 N.H. 925, 424 A. 2d 825; *Arneson* v. *Olson* (N.D. 1978), 270 N.W. 2d 125; *Baptist Hospital of Southeast Texas* v. *Baber* (Tex. App. 1984), 672 S.W. 2d 296; *Jones* v. *State Bd. of Medicine* (1976), 97 Idaho 859, 555 P. 2d 399, certiorari denied (1977), 431 U.S. 914. The following cases have held that limitation of medical malpractice damages is constitutional: *Fein* v. *Permanente Medical Group* (1985), 38 Cal. 3d 137, 695 P. 2d 665; *Johnson* v. *St. Vincent Hospital, Inc.* (Ind. 1980), 404 N.E. 2d 585; *Prendergast* v. *Nelson* (1977), 199 Neb. 97, 256 N.W. 2d 657.

The California Supreme Court case, *Fein, supra,* is easily distinguishable. California Civ. Code Section 3333.2 provides as follows:

"(a) In any [medical malpractice] ac-

tion * * * the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.

"(b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

The avowed purpose of the California statute, and the Ohio statute, is to "reduc[e] the costs of malpractice defendants and their insurers" (*Fein, supra,* at 680), and this California legislation has withstood a constitutional assault because it "placed no limits whatsoever on a plaintiff's right to recover for all of the economic, pecuniary damages — such as medical expenses or lost earnings — resulting from the injury." (Emphasis deleted.) *Id.*

The Ohio statute does not make this valid damage distinction, for our limitation is on general damages, *i.e.,* those which "necessarily result from the injury complained of." 30 Ohio Jurisprudence 3d (1981) 172, Section 165.

The persuasive precedential value of the logic in the California Supreme Court is, therefore, not relevant in a determination of the legal vitality of Ohio's statute.

The *Johnson* case also is distinguishable. Indiana Code Sections 16-9.5-1-1 through 16-9.5-10-5 ("Indiana Medical Malpractice Act") provide for a "government sponsored risk spreading mechanism as an alternative to insurance strictly from private sources" (*id.* at 601) and limit only awards from participants in this fund. Thus, injured plaintiffs are protected because Indiana has provided a device for all health care providers to obtain coverage. Ohio has not. The amount of the damage limitation is also double what Ohio limits.

In *Prendergast, supra,* the Supreme Court of Nebraska held a statutory scheme of a $500,000 limitation constitutional because of the voluntary election provision of receiving compensation from an assured fund that was set up by the state. That legislation also has different constitutional safeguards and, therefore, that case is not persuasive upon this court.

*Dowdy, supra,* was decided by the Court of Appeals for Stark County, the same court that decided *Nervo, supra.* The constitutionality issue was not addressed.

*Keeton, supra,* seriously questions the purpose of the legislation in that the only real beneficiaries are malpractitioners and their insurers and further that there is no evidence of a lessening of the available health care to the public. *Keeton* was decided "despite the lack of adversary process," and held that the plaintiff had not supplied that court "with any basis upon which to declare the statute unconstitutional." This court simply disagrees with federal Judge Contie's conclusion.

The various decisions which have held damage limitation statutes in medical malpractice cases as unconstitutional initially recognize this type of legislation as being a proper subject for legislative action. Both due process and equal protection arguments have been the basis of the piercing of the presumption of constitutionality of similar statutes and no valid purpose is served by a recitation of each one of those cases.

Simply stated, the legislative scheme of shifting responsibility for loss from one of the most affluent segments of society to those who are most unable to sustain that burden, *i.e.,* horribly injured or maimed individuals, is not only inconceivable, but shocking to this court's conscience. The often-cited case of *Carson* v. *Maurer, supra,* best states the basis for declaring this type of legislation as being unconstitutional in the following manner:

"It is simply unfair and unreason-

able to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation." *Id.* at 942.

This court holds that R.C. 2307.43 violates the protection of both the Ohio and federal Constitutions beyond a reasonable doubt.

## III

Defendant urges this court to order a new trial in that the judgments entered on both the survivorship and wrongful death claims are excessive, appearing to have been given under the influence of passion or prejudice.

Under Ohio law, it is not the mere size of a verdict *per se* that affords proof of passion or prejudice. *Pearson* v. *Cleveland Acceptance Corp.* (1969), 17 Ohio App. 2d 239 [46 O.O.2d 411]; *Gates* v. *Strong* (1966), 14 Ohio App. 2d 121 [43 O.O.2d 278]. It must appear that the jury's assessment of damages was so disproportionate as to shock reasonable sensibilities. *Spicer* v. *Armco Steel Corp.* (App. 1974), 68 O.O. 2d 314.

In this case, the jury had the opportunity to show that it was influenced by passion and prejudice, for the issue of punitive damages was submitted for their consideration. The jury declined to demonstrate any passion and prejudice when they did not return punitive damages.

Considering all of the facts in this case, the verdicts were not given under the influence of passion or prejudice.

## IV

Defendant claims that the judgments entered on both the survivorship claim and the wrongful death claim are excessive and not supported by the weight of the evidence and, therefore, requests a new trial.

In order to justify a new trial on these grounds, the verdict must be so clearly against the weight of the evidence that unbiased and unprejudiced minds could not have reached the conclusion reached by the jury. 40 Ohio Jurisprudence 2d (1967), New Trial, Section 65. Mere disagreement with a jury's verdict does not warrant a new trial. *Parm* v. *Patton* (1969), 20 Ohio App. 2d 83 [49 O.O.2d 95]. In this case, the verdict is supported by competent, substantial and credible evidence. Defendant hospital's culpability was of such an extreme nature that it would support a determination of negligence even under the scrutiny of an R.C. 2901.05 proceeding. The defendant should not be granted a new trial. This argument has no merit.

## V

Defendant's fifth alleged basis for a new trial is two-pronged. Initially, defendant contends that the judgment entered on the wrongful death claim is not supported by the weight of the evidence in that plaintiff did not prove that with proper medical treatment, the decedent probably would have survived. The basic law pertaining to medical malpractice is set forth in *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127 [75 O.O.2d 184]. Therein, the Supreme Court required that the plaintiff must, through competent expert testimony, first establish the standard of care applicable to the hospital sued, and then in what respects the hospital deviated from an acceptable standard of care, and finally, in what manner such deviation was, in fact, a proximate cause of the death claimed.

The law of proximate cause in a wrongful death malpractice case obligates the plaintiff to prove at least a fifty-one percent probability of survival if it were not for the negligence of the defendant. *Cooper* v. *Sisters of Charity* (1971), 27 Ohio St. 2d 242 [56 O.O.2d 146].

The following excerpts from the transcript make it abundantly clear that

the plaintiff sustained her burden on these issues:

"Direct examination of Jay R. Shapiro, M.D.

"Q. Had he received attention and care that particular evening starting at any point in time, perhaps from 10:00 o'clock, perhaps sooner, including the stat test being done stat [*sic*], do you have an opinion as to whether or not, based on probabilities, if appropriate things had been done based on his condition, that he would or would not have survived based upon probability?

"MR. MURPHY: Objection.

"THE COURT: Doctor, you understand all these questions are based upon a reasonable degree of medical certainty?

"THE WITNESS: Yes.

"THE COURT: Go ahead.

"A. I think it would be reasonably certain that had he received aggressive therapy, he well may have pulled through. I would say yes. That is, his signs being monitored, some of complications being anticipated.

"* * *

"Q. Would you please give your assessment?

"A. My assessment is that had Dr. Lissauer acted on these various bits of information that the likelihood is that it is probable that Mr. Duren would have survived."

"Cross-Examination of Jay R. Shapiro, M.D. by Mr. Nurenberg

"Q. As a predicate to that, and I am going to ask you a few questions about that in a minute, I gather from the answers that you gave this morning, you correct me if I'm wrong, that regardless of what you think Dr. Lissauer should or shouldn't have done before 10:00, that if he had been informed, as he was entitled to be informed by the nurses, of this departure and his vital signs, and if at that time he had responded in what you believe to be an appropriate aggressive management, that there was a reasonable chance that the patient could have been pulled through?

"A. Yes.

"* * *

"Q. But you are not saying that that is why the man died, are you?

"A. I'm saying that it is probable that had these — this multitude of factors been considered that the man would have lived.

"Q. What multiple factors?

"A. The multiple factors are what was causing his deoxygenation, his hypoxenia, what was his blood sugar and how was that influencing the course of his illness. The man was said to have continuing pain. These things suggested that obviously there was an ongoing process, and the question was, should one have intervened."

The second prong of defendant's fourth assigned error is that the trial court erred in failing to instruct the jury that plaintiff had the burden of proving that with proper medical treatment, decedent *probably* would have survived. Upon review of the court's charge, it can be demonstrated that this contention of the defendant is without merit. The charge properly sets forth the elements plaintiff must prove in a wrongful death action arising out of an incident of medical malpractice. The statement which defendant claims is lacking in the jury instructions is the converse of what was, in fact, given to the jury; moreover, the court's presentation is simply more straightforward:

Court's Charge

"The recognized duty or standard of care in the medical community and any alleged failure to meet that standard of care or standard of duty and the causal link between the negligent act and the injury sustained are to be established by expert testimony.

"Now, if you find by a preponderance of the evidence that the defendant, Dr. Lissauer, was negligent, then you

will proceed to determine whether his negligence improbability [*sic*] proximately caused John Duren's injury and/or death.

"If you find that the defendant, Dr. Lissauer, was not negligent, you will then only consider whether the negligence of the defendant Suburban Community Hospital improbability [*sic*] proximately caused John Duren's injury and/or death.

"What is proximate cause?

"A party who seeks to establish negligence must prove not only that the other party was negligent, but also that such negligence was a proximate cause of injury and/or death. Proximate cause is an act or a failure to act, this which in the natural and continuous sequence directly produces a death and/or injury and without which it would have not occurred."

## VI

The sixth alleged basis for a new trial recites that the trial court erred in failing to instruct the jury on the issue of comparative negligence insofar as it relates to the negligence of the decedent in not following proper medical advice, and that such negligence contributed to both his conscious pain and suffering and death. This argument is untenable. With regard to the alleged negligence of the defendant hospital and employees, plaintiff's decedent could not have been comparatively negligent so as to contribute to his own pain and suffering. On February 17, 1982, at approximately 1:30 p.m., plaintiff's decedent was admitted to Suburban Community Hospital by a doctor familiar with his medical history. Plaintiff's decedent died on February 18, 1982, at 7:17 a.m. He was a patient for less than twenty-four hours. The cause of death was the defendant hospital's failure to care for the decedent. How can it rationally be stated that a person who is not attended to in the proper manner while under a program of involuntary nourishment through an intravenous mechanism caused his own death?

The only pain and suffering on which the jury returned a verdict was that which was caused by the negligence of the defendant hospital as they were instructed by this court. There was no advice or instructions of the defendant hospital that Mr. Duren did not follow.

## VII

All of the defendant's grounds for a new trial also form its alleged basis for a remittitur. *Spearman* v. *Meyers* (1968), 15 Ohio App. 2d 9, 11 [44 O.O.2d 72], sets forth the standard for determining such a request as follows:

"* * * However, where the court is of the opinion that the verdict is excessive but not due to the effect of passion and prejudice, determination is made under Section 2321.17(F), Revised Code, that the judgment is not sustained by the evidence. *In the case of unliquidated claims it has long been held that the trial court finding the verdict excessive, but not due to passion or prejudice, may, with the consent of the plaintiff, remit a portion of the verdict and, as an alternative to a new trial, enter judgment in the lesser amount. Thomas* v. *Titus,* 169 Ohio St. 203 [8 O.O.2d 166]; *Larrissey, Admx.,* v. *Norwalk Truck Lines, Inc.,* 155 Ohio St. 207 [44 O.O. 238]." (Emphasis added.)

This court has already ruled the verdicts returned were not the result of passion and prejudice.

The wrongful death verdict represents proper compensation for the next of kin considering the factors relevant to that determination as promulgated by R.C. 2125.02. See, 2 Speiser, Recovery for Wrongful Death (2 Ed. 1975), Section 14:10; Stein, Damages and Recovery — Personal Injury and Death Actions (1972), Section 269. This court's direct observation of the next of kin does not suggest the wrongful death award is

shocking, unreasonable or outrageous. See 30 Ohio Jurisprudence 3d (1981), Damages, Section 207.

The award for conscious pain and suffering presents a unique problem. Death has sealed the lips of Mr. Duren so he cannot express the agony and mental anguish that he experienced. Surely, almost any person would say he could endure great pain in exchange for one million dollars, but what amount can compensate a person who may know that such pain would result in death? A court cannot remove itself into the confines of a sterile setting and abstractly use legal standards that have withstood the assault of time to reduce a verdict solely because of its size. Mr. Duren endured a great amount of pain and suffering, completely alone. Relief for his physical pain and mental suffering was available. His physician was not called nor his family notified. The house doctor, for whatever reason, never came to his aid until death had a firm grip on what remained of his life. The jury's task of placing a value on Mr. Duren's pain and suffering during his last lonely hours of February 17 and 18, 1982, was difficult indeed.

However, economic irreverence could only justify the affirmance of this jury's award for pain and suffering. Sound judgment and sensible thought compels this court to grant the defendant's remittitur in the amount of $500,000, and plaintiff has consented to this amount.

### VIII

Plaintiff requests that she be awarded prejudgment interest. R.C. 1343.03(C) prohibits an award of prejudgment interest unless the court determines at a hearing "that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." Lack of good faith "requires more than bad judgment or negligence" and "imports a dishonest purpose, conscious wrongdoing or breach of a known duty based on some ulterior motive or ill will in the nature of fraud." *Ware* v. *Richey* (1983), 14 Ohio App. 3d 3, paragraph five of the syllabus. Good faith efforts also include:

(a) an affirmative effort to gather relevant data;

(b) an affirmative effort to disclose relevant data to the adversary;

(c) an affirmative effort to evaluate that party's risks in litigation reasonably; and

(d) an affirmative effort to propose settlement consistent with that reasonable evaluation. See *Carmo* v. *Frankel* (1984), 17 Ohio Misc. 2d 3.

In *Black* v. *Bell* (1984), 20 Ohio App. 3d 84, 88, it was stated that a jury verdict is essentially irrelevant to this court's inquiry:

"The statute affords no remedy, nor does it deny a remedy, because one or both parties predict or fail to predict the ultimate verdict accurately. If the legislature intended to allow prejudgment interest whenever the verdict exceeded or approximated the plaintiff's settlement offer, the statute would so state. At most, the proximity of one party's settlement offer to the ultimate verdict is conceivably some circumstantial evidence of the reasonableness of that party's evaluation. It falls far short of demonstrating that such party made a good faith effort to settle or that the adverse party failed to do so. * * *

"Fortuitous foresight does not demonstrate good faith settlement efforts. Nor does poor predictive ability necessarily establish a failure to make such efforts. * * *"

See, also, *Presrite Corp.* v. *United Steel Workers of America* (June 6, 1985), Cuyahoga App. No. 48113, unreported, at 42 (the fact that the jury awarded more than the defendant offered in set-

tlement "does not require an award of prejudgment interest").

During the trial, this court had the following discussion with counsel which now has a direct bearing upon plaintiff's request for prejudgment interest:

"(Thursday Morning Session, February 7, 1985)

"THE COURT: Nobody take any inference of any nature or kind from what I am saying.

"I had made a mental note to myself on Sunday night. I was going over my notes last night and didn't do something that I wanted to do before I started on Monday. Don't take any inference of any nature or kind.

"It is my understanding, and I would prefer just a yes or a no answer without any discussion, that as of last Friday—as of February of 1984 that there was a lump-sum cash offer of $450,000? Stay with Mr. Murphy.

"MR. MURPHY: I'm not sure of the date you are asking, Judge.

"That's right. We are in '85, aren't we? At that time.

"THE COURT: And that as of that time there was a demand in excess of seven figures, in excess of a million dollars?

"MR. KAMPINSKI: That's correct.

"THE COURT: That as of last Friday afternoon that there was a lump-sum offer of a total of $650,000, which included $550,000 from the St. Paul Insurance Company and $100,000, if that would settle the case, from Suburban Community Hospital?

"MR. MURPHY: That's right. That's my understanding.

"THE COURT: Is that your understanding, Mr. Kampinski?

"MR. KAMPINSKI: Yes, it is.

"THE COURT: As of last Friday afternoon there still was a demand of a figure of at least seven figures, at least a million dollars?

"MR. KAMPINSKI: That's correct.

"THE COURT: Has there ever been

a specific demand individually against Dr. Lissauer?

"MR. KAMPINSKI: There has not.

"THE COURT: Has there ever been any offer specifically on behalf of Dr. Lissauer?

"MR. NURENBERG: No, your Honor.

"THE COURT: Has there ever been a specific demand against the hospital's insurance company?

"MR. KAMPINSKI: I think the answer is yes.

"THE COURT: Has there ever been a specific demand against the hospital themselves for a sum of money that would represent what your assertion for punitive damages is?

"MR. KAMPINSKI: The answer to that is yes, I believe.

"THE COURT: What was that?

"MR. KAMPINSKI: I believe it was $250,000.

"THE COURT: Is that your understanding?

"MR. ZELLERS: Yes, it is.

"THE COURT: You stand ready, willing and able to offer $100,000 to settle the case in conjunction with everything else?

"MR. ZELLERS: That's correct, your Honor.

"(Thereupon, the in-chamber discussion was adjourned.)"

The above-quoted discussion capsulizes the state of negotiations up to the trial date.

This case is unique, for it is a medical malpractice matter which had been referred pursuant to Ohio's mandatory arbitration statute. This court therefore considers all of the evidence taken at the hearing on the motion for prejudgment interest along with giving weight to the judgment of the arbitrators, the nature of their practice and their degree of expertise, and holds that prejudgment interest shall not be awarded.

## IX

Plaintiff has requested that the defendant be assessed various expenses for numerous depositions, experts' expenses, and daily copy during the trial. Plaintiff cites Civ. R. 54(D). *Jones* v. *Pierson* (1981), 2 Ohio App. 3d 447, has support for this proposition. Therein, Judge Krenzler stated that in order for one to determine whether or not an expense will be liable as a cost under Civ. R. 54(D), the court should first determine whether or not the expense was a "taxable litigating expense" and then determine whether or not the litigating expense "should be taxed as a cost in the particular case at bar." *Id.* at paragraph one of the syllabus.

None of the depositions referred to in plaintiff's request for reimbursement of litigating costs was used in the plaintiff's case-in-chief. Parties have always borne their own expenses, and under the facts in this particular case, to hold otherwise would be an abuse of discretion. Plaintiff's request to tax expenses as costs is denied.

All motions for new trial are denied.

Remittitur granted on the survivorship claim in the amount of $500,000.

*Judgment accordingly.*