798 P.2d 571

**Lawrence TRUJILLO, Petitioner,**

v.

**The CITY OF ALBUQUERQUE, et al., Respondents.**

**No. 18296.**

Supreme Court of New Mexico.

Aug. 27, 1990.

Motion to Compel Payment Granted Oct. 3, 1990.

Bruce P. Moore, Duhigg, Cronin & Spring, David L. Duhigg, Albuquerque, for petitioner.

James H. Foley, City Atty., Albuquerque, Hinkle, Cox, Eaton, Coffield & Hensley, Joe W. Wood, Ellen S. Casey, Santa Fe, Rodey, Dickason, Sloan, Akin & Robb, James C. Ritchie, Albuquerque, for respondents.

Carpenter & Goldberg, William H. Carpenter, Albuquerque, Michael B. Browde, Albuquerque, for amicus curiae New Mexico Trial Lawyers Ass'n.

Judith A. Olean, Steven Barshov, Santa Fe, for amicus curiae NM Mun. League.

Miller, Stratvert, Torgerson & Schlenker, Alice Tomlinson Lorenz, Albuquerque, for amicus curiae NM Medical Soc.

Modrall, Sperling, Roehl, Harris & Sisk, Kathryn D. Lucero, Albuquerque, for amicus curiae Risk Management Div.

## OPINION

RANSOM, Justice.

Lawrence Trujillo obtained a personal injury judgment of $547,905.80 against the City of Albuquerque. His injuries occurred when a City employee, Clarence M. Wright, drove a City crane through a red light and collided with a cement truck driven by Trujillo. Negligent maintenance of the crane's brakes and its negligent operation were found by the court in this nonjury trial to be concurrent proximate causes of the collision.

The trial court determined that, under Section 41–4–19(A)(2) of the Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl.Pamp.1986), the accident involved two occurrences, and thus that the limit of the City's liability under the Tort Claims Act was twice the $300,000 cap for "any person for any number of claims arising out of a single occurrence." The court of appeals reversed this determination. The court of appeals also reversed the trial court's ruling that the damage provisions in question violated Trujillo's right to equal protection under the federal and state constitutions. We granted certiorari to review these issues. Amicus briefs were filed in this Court and before the court of appeals by the New Mexico Trial Lawyers Association (NMTLA), the New Mexico Municipal League, the New Mexico Medical Society, and the Risk Management Division of the State General Services Department (Risk Management). Upon review of the opinion of the court of appeals, the briefs, and the record, we affirm in part, reverse in part, and remand with instructions.

■ *Negligent maintenance and negligent operation of vehicle gave rise to a single occurrence.* The trial court found two proximate causes produced the accident: (1) the City's negligent maintenance of the crane's brakes, and (2) Wright's negligent operation of the crane. Trujillo argues that under a causation theory there are two occurrences. However, in *Folz v. State,* 110 N.M. 457, 797 P.2d 246 (1990), this Court rejected a causation rationale relied upon by the court of appeals to define a single occurrence in that case. In *Folz* we held that, when a governmental entity has committed successive negligent acts or omissions, the determination of the number of occurrences cannot be made simply by counting the number of such acts or omissions. As did the court of appeals in the present case, we specifically noted in *Folz* that multiple proximate causes attributable to the governmental en-

tity may combine with other concurrent causes to produce but a single occurrence.

Here, the City's negligent maintenance of the crane's brakes produced a risk of harm that was concurred in and triggered by Wright's negligent operation of the crane. The risk created by the faulty brakes gave rise to liability only when Wright drove the crane into the intersection. Therefore, we hold there was but a single occurrence when successive negligent acts or omissions of the governmental entity combined concurrently to create a singular risk (of collision) and to proximately cause injury triggered by a discrete event (the crane's entry into the intersection).[1]

*Constitutionality of individual cap—nature of the issue.* The trial court found Section 41–4–19 to be unconstitutional because "no rational distinction [exists] between victims of a tort inflicted by a private person and victims of a tort inflicted by a public employee or [a governmental] entity." The court of appeals (applying heightened or intermediate scrutiny rather than the rational basis test employed by the trial court) reversed, stating "the Act's limitation on damages does substantially further an important state interest—the need to protect the public treasury from large awards." *See Richardson v. Carnegie Library Restaurant,* 107 N.M. 688, 692–98, 763 P.2d 1153, 1157–63 (1988) (discussing rational basis, intermediate scrutiny, and strict scrutiny tests under equal protection analysis). Because we do not believe a sufficient factual basis exists for the court of appeals' determination, we reverse and remand for further proceedings.

■ *Interest of tort victims in "full recovery of damages" calls for intermediate scrutiny of Section 41–4–19(A)(2) under Article II, Section 18 of the New Mexico Constitution.* As we use the term, "full recovery of damages" is delimited only by the measure of damages recognized in law as recoverable by any person wronged by the conduct of another. In *Richardson* we held that a tort victim's interest in full recovery of damages implicitly was protected under the state constitutional right of access to the courts. 107 N.M. at 692, 763 P.2d at 1157. We previously have recognized the right of access to the courts as a protected interest under the due process clause of Article II, Section 18 of the New Mexico Constitution. *See id.* at 696, 763 P.2d at 1161 (quoting *Jiron v. Mahlab,* 99 N.M. 425, 426, 659 P.2d 311, 312 (1983)). *Richardson* applied the equal protection clause of Section 18 to determine whether the damage cap in the dram shop act, NMSA 1978, § 41–11–1 (Repl.Pamp.1986), discriminated between different classes of tort victims on an impermissible basis. *Id.* 107 N.M. at 698, 763 P.2d at 1162; *see* N.M. Const. art. II, § 18 ("No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws.").

■ We declined to decide in *Richardson,* however, whether to apply strict scrutiny to such equal protection challenges in the future, "principally because we conclude[d] that the damage cap [in the dram shop act] is constitutionally invalid under the lesser, intermediate scrutiny test." *Id.* at 696, 763 P.2d at 1161.[2] The plurality came to this conclusion because "[n]o argument [was] presented ... to persuade us

---

1. Although the court found Wright failed to yield the right-of-way, failed to stop for a red light, failed to maintain a proper lookout, and drove inattentively, these were not separate triggering events but were acts and omissions that concurred to constitute a discrete triggering event.

2. Some form of strict or heightened scrutiny will be employed when legislation affects a fundamental right or an important individual interest, or when the legislature classifies on the basis of membership in a suspect or semi-suspect class of persons. *See Richardson,* 107 N.M.

at 693, 763 P.2d at 1158. Legislative classifications will be upheld under strict scrutiny only if the proponent of a classification's validity demonstrates that "the law ... advance[s] a compelling state interest by the least restrictive means available." *Bernal v. Fainter,* 467 U.S. 216, 219, 104 S.Ct. 2312, 2315, 81 L.Ed.2d 175 (1984). Under intermediate scrutiny the proponent must demonstrate that the legislative classification is substantially related to an important governmental interest. *Richardson,* 107 N.M. at 695, 763 P.2d at 1160.

that the classifications created by the legislation are constitutionally legitimate." *Id.* at 699, 763 P.2d at 1164. *Cf. id.* at 702, 763 P.2d at 1167 (Ransom, J., specially concurring in result, but reserving judgment on ultimate question of statute's constitutionality) ("This case does not demonstrate ... that a substantial state interest might not have been shown if the defendant had pressed forward responsibly with the burden enunciated by this Court today."). Because this case is to be remanded for further proceedings, we find it necessary to decide the question avoided in *Richardson*—whether to apply strict or merely intermediate scrutiny.

*—When particular classes of tort victims receive unequal treatment, importance of right to full recovery of damages requires more than rational basis review.* *Richardson* appeared to base its interpretation of Article II, Section 18 in part on the history of tort recovery in New Mexico as an aspect of the right of access to the courts. 107 N.M. at 691, 692, 763 P.2d at 1156, 1157 (approving as correct the amicus curiae analysis that traced jury and access-to-court rights to their roots in Spanish and Mexican laws, *Siete Partidas, Fuero Juzgo,* and Kearney Code; such rights, amicus argued, formed an integral part of civil law prior to statehood and were incorporated into the New Mexico Constitution).[3] The right to recover monetary damages for tortious injury has played a vital role in New Mexico since before the time of statehood as one aspect of the individual right to petition for redress of grievances. *See id.* at 696, 763 P.2d at 1161.

However, we do not interpret *Richardson*'s rejection of minimum rationality review as resting on the bare fact that monetary damages for tortiously inflicted injury were awarded prior to statehood. Instead, *Richardson*'s application of heightened scrutiny ultimately rests on the continued importance of the right to such compensation today and on the possibility that the rights of particular classes of tort victims will be sacrificed to social expediency in the legislative process. *See id.* at 698–99, 763 P.2d at 1163–64 (tort victim's right to be compensated for injury and the sensitivity of particular classes of tort victims to injustice wrought by legislation limiting this right justify application of heightened scrutiny).

Our fault system of recovery, while by no means indispensable to our society in an abstract sense,[4] today serves the important social functions of redistributing the economic burden of loss from the injured individuals on whom it originally fell, deterring conduct that society regards as unreasonable or immoral, and providing a vehicle by which injured victims may obtain some degree of compensation and satisfaction for wrongs committed against them and by which society may give voice and form to its condemnation of the wrongdoer. The debate over the policy question of whether the tort system is the best mechanism for performing the functions currently allocated to it is one of great current concern and importance. It is entirely appropriate that

---

3. Before the court of appeals in the present case, NMTLA argued that a right to full legal redress was incorporated into New Mexico law by way of the Kearney Code provision guaranteeing "just remedy" for legal wrongs. NMSA 1978, "Bill of Rights," Territorial Laws and Treaties, Pamp. 3, at 1. While, as discussed in the text of this opinion, we do not elevate a tort victim's interest in full recovery of damages to the level of a fundamental right as urged by NMTLA, we base our determination of the appropriate level of scrutiny in part on our state's traditional solicitude for such interests.

4. We note that a number of jurisdictions consider the constitutionality of legislative modifications of common-law rights in terms of whether the legislature has provided a quid pro quo to plaintiffs in the form of an adequate substitute remedy or corresponding benefit. *See, e.g., Smith v. Department of Ins.,* 507 So.2d 1080, 1088–89 (Fla.1987); *Wright v. Central Du Page Hosp. Ass'n,* 63 Ill.2d 313, 328, 347 N.E.2d 736, 742 (1976); *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 344, 757 P.2d 251, 258–59 (1988); *Carson v. Maurer,* 120 N.H. 925, 943, 424 A.2d 825, 837–38 (1980); *Lucas v. United States,* 757 S.W.2d 687, 690–91 (Tex.1988). Legislative provision for a quid pro quo is not an essential requirement under our equal protection analysis; however, as explained in footnote 6 of this opinion, such provision may affect the ultimate balancing to be performed under heightened scrutiny.

policy choices flowing from such debate take place in the legislative sphere. However, counterposed to society's interest in the workings of the tort system are undeniably important and substantial individual interests.

While, as explained below, we decline to express an opinion on the constitutionality of this particular statute, we firmly adhere to the proposition that the legislature, in effecting its policy choices, may not disregard lightly the important and substantial individual interests served by the recovery of tort damages. We are satisfied that we "neither trample arbitrarily upon the legislature's preferred position of direct, political accountability ... nor do we forsake our duty to protect individuals" when we employ heightened scrutiny "in those limited circumstances when the class implicated is so sensitive to injustice and the rights affected are so substantial and important" as they are here. *Richardson*, 107 N.M. at 698, 763 P.2d at 1163.

Although the distinctive features of our Constitution's text and history always must play an important role in this Court's interpretation of the scope and meaning of its provisions, the ample authority cited in *Richardson* from other jurisdictions also supports our decision to apply at least some form of intermediate scrutiny to damage caps such as those contained in the Tort Claims Act. *Id.* at 695 n. 5, 763 P.2d at 1160 n. 5 (citing *Coburn v. Agustin*, 627 F.Supp. 983, 995 (D.Kan.1985) (medical malpractice); *Farley v. Engelken*, 241 Kan. 663, 672, 740 P.2d 1058, 1064 (1987) (medical malpractice); *Sibley v. Board of Supervisors of La. State Univ.*, 477 So.2d 1094, 1107 (La.1985) (medical malpractice); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978) (medical malpractice)). *See also Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 730 P.2d 186 (1986) (media defamation statute), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987); *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984) (statute abolishing "discovery rule" in medical malpractice actions); *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill.2d 313, 347 N.E.2d 736 (1976) (medical malpractice); *Kansas Malpractice Victims Coalition v.*

*Bell*, 243 Kan. 333, 757 P.2d 251 (1988) (medical malpractice); *Duren v. Suburban Community Hosp.*, 24 Ohio Misc.2d 25, 495 N.E.2d 51 (1985) (medical malpractice); *Lyles v. Commonwealth Dep't of Transp.*, 512 Pa. 322, 516 A.2d 701 (1986) (tort claims act); *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988) (medical malpractice); *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989) (provisions of Utah governmental immunity act that applied to government-run hospitals); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (tort reform bill), *modified on other grounds*, 780 P.2d 260 (1989).

*—Principle of equal access to the courts limits power of the legislature.* In listing jurisdictions that applied strict scrutiny to damage caps, *Richardson*, 107 N.M. at 695, 763 P.2d at 1160, cited the 1985 Montana case of *Pfost v. State*, 219 Mont. 206, 713 P.2d 495 (1985) (tort claims act limit on damages). *See also White v. State*, 203 Mont. 363, 661 P.2d 1272 (1983) (pre-*Pfost* tort claims act limit on economic and noneconomic damages). In *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 776 P.2d 488 (1989), the Montana Supreme Court overruled *Pfost* and *White*. These two cases had based the existence of a fundamental right to recovery of tort damages on the "speedy remedy" provisions of the Montana Constitution. *Meech*, 238 Mont. at 27–30, 776 P.2d at 491–92, traced such access-to-court provisions of state constitutions back to the Magna Carta and, relying on Montana precedent predating *Pfost*, held that this article of the Montana Constitution "did not constrict legislative powers because [it] only provided a mandate to the courts to provide equal access to causes of action recognized at law." 238 Mont. at 27, 776 P.2d at 491–92 (citing *Shea v. North-Butte Mining Co.*, 55 Mont. 522, 179 P. 499 (1919); *Stewart v. Standard Pub. Co.*, 102 Mont. 43, 55 P.2d 694 (1936); *Reeves v. Ille Elec. Co.*, 170 Mont. 104, 551 P.2d 647 (1976)). *But see Lucas*, 757 S.W.2d at 690 (open court guarantee of Texas Constitution based on provisions of Magna Carta

and necessitated judicial review of medical malpractice cap).

We do not interpret the New Mexico Constitution as creating a mandate only to the judicial branch to provide equal access to the courts. In our tripartite system of state government, each branch at times properly may exercise its constitutional authority in matters that affect the workings of a coordinate branch. *See, e.g., State ex rel. Chavez v. Vigil–Giron,* 108 N.M. 45, 766 P.2d 305 (1988) (judicial review of constitutional amendment on judicial reform that was drafted by the legislature and ratified by the voters). We adhere to the view expressed by the Kansas Supreme Court, among others, that "[o]ur constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution." *Samsel v. Wheeler Transp. Servs., Inc.,* 246 Kan. 336, 348, 789 P.2d 541, 549 (1990) (finding statutory limit on noneconomic tort damages constitutional under a form of intermediate scrutiny). We would ill serve our role as guardian of the constitution were we to exclude the legislature from the reach of the constitutional guarantee of equal access to the courts: Thus restricted, that guarantee would become largely "toothless." *Meech,* 238 Mont. at 64, 776 P.2d at 514 (Sheehy, J., dissenting).

*—Nature of the individual interest and nature of the classification are the sole determinate of level of scrutiny.* Risk Management argues that we should apply a different level of scrutiny to the Tort Claims Act than we did to the dram shop act, because "damage limitations [in tort claims acts] typically [bind] governmental waivers of immunity within reasonable parameters." Risk Management points out that courts in other states have applied a less strict standard when reviewing equal protection challenges to legislation limiting governmental liability. *Compare Cauley v. City of Jacksonville,* 403 So.2d 379 (Fla. 1981) ($50,000 limit on liability of state or subdivision upheld under rational basis review) *with Smith v. Department of Ins.,* 507 So.2d 1080 (Fla.1987) ($450,000 cap on recovery of noneconomic damages in gener-

al tort reform statute found unconstitutional under a form of heightened scrutiny); *Jones v. State Bd. of Medicine,* 97 Idaho 859, 871, 555 P.2d 399, 411 (1976) (intermediate, "means-focus" scrutiny applied to medical malpractice cap), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) *with Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983) (rational basis applied to tort claims act); *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 406 A.2d 704 (1979) (governmental tort cap upheld under rational basis standard), *appeal dismissed,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980) *with Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980) (invalidating medical malpractice cap under form of intermediate scrutiny).

We are not persuaded. We note first that Idaho's "means-focus" standard of review, unlike the variety of heightened scrutiny adopted in *Richardson,* is triggered only when the legislative classification patently lacks a reasonable relationship to the legislative purpose *and* is discriminatory on its face. *Leliefeld* applied rational basis review to the statutory limit on governmental liability because the purpose of the statute under consideration appeared to bear a reasonable relationship to the classification scheme created. 104 Idaho at 373, 659 P.2d at 127 (citing *Jones,* 97 Idaho at 871, 555 P.2d at 411). By contrast, in terms of the threshold inquiry established in *Richardson,* the damage cap contained in Section 41–4–19(A)(2) is identical to the damage cap contained in the dram shop act.

Second, the New Hampshire Supreme Court applied minimum rationality review in *Estate of Cargill* solely because the damage cap in New Hampshire's tort claims act implicated neither a suspect class nor a fundamental right. 119 N.H. at 666–67, 406 A.2d at 707. The court did not discuss the possibility of an intermediate level of review. That the damage cap applied to the *government* was considered by the court only in determining whether the classification bore a rational relationship to its purpose, not in deciding which level of scrutiny to apply. *Id.* at 666–68, 406 A.2d at 706–07. The court's application of a type of "heightened scrutiny" to the medi-

cal malpractice cap in *Carson*, therefore, appears to have modified the law:

> In [*Estate of Cargill*] we applied the rational basis test in evaluating classifications which ... place restrictions on an individual's right to recover in tort. *We now conclude, however, that the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test.*

*Carson*, 120 N.H. at 932, 424 A.2d at 830 (emphasis added). *See also State v. Brosseau*, 124 N.H. 184, 197, 470 A.2d 869, 877 (1983) (Douglas and Batchelder, JJ., specially concurring) (under *Carson*, right of tort victim to recover for injuries is an important substantive right, and doctrine of sovereign immunity should be declared unconstitutional to the extent it denies a just remedy to an injured party).

By contrast, the Florida Supreme Court clearly relied on the fact that the damage cap at issue limited governmental liability when it applied a different level of review in *Cauley*. The court noted, 403 So.2d at 384–85, that under the rule set forth in *Kluger v. White*, 281 So.2d 1 (Fla.1973), the Florida Constitution limited the state legislature's authority to cap tort damages only when (1) the right affected was statutory and predated the enactment of the Florida Constitution, or (2) the right had become part of the state's common law prior to that time. Since there existed no common law or statutory right to sue a municipality at the time of the enactment of the state constitution, the court concluded that the state constitution did not limit the legislature's plenary authority to abrogate sovereign immunity. 403 So.2d at 385; *see also* Fla. Const. art. X, § 13 (right to authorize suit against the state reserved for legislature). *Cf. Smith v. Department of Ins.*, 507 So.2d at 1088 (under *Kluger*, legislation capping medical malpractice damages would be upheld only if (1) it provided a reasonable alternative remedy or commensurate benefit, or (2) there was a showing of overpowering public necessity and no alternate method for meeting such public necessity).

We decline to follow Florida's "vested rights" approach. Our equal protection inquiry does not seek to identify particular causes of action (or particular legal remedies) as being "so important that they must be insulated from whatever inhibition the political process might impose." J. Ely, *Democracy and Distrust: A Theory of Judicial Review*, 75 n. *. Our inquiry instead concerns itself with how decisions effecting policy choices between *existing* rights and governmental goals distribute their resultant costs and benefits. *See id.; see also Lucas*, 757 S.W.2d at 690 (litigant's right of redress under state constitution measured in terms of whether litigant possessed cognizable cause of action presently recognized at common law). The nature of the individual interest and of the legislative classification determines the appropriate level of scrutiny, not the importance of the government's goal or the vagaries of history.

■ This case presents no issue, nor do we purport to decide, whether the New Mexico Constitution requires judicial or legislative recognition of liability for a particular type of tort. However, our common and statutory law presently recognize a right to recover damages for persons injured by the torts committed in this case. So long as the state chooses to provide particular rights to litigants, it must allow litigants to exercise these rights in a manner that comports with principles of equal protection and equal access to the courts, and it may not limit the exercise of such rights selectively unless the limitation is justified by a counterbalanced state interest of sufficient weight. *See generally Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (right of criminal appeal); *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (state law regarding divorce); L. Tribe, *American Constitutional Law* § 16–11 (2d ed. 1988).

—*Constitutionality of Section 41-4-19(A)(2) to be determined under intermediate rather than strict scrutiny.* Strict scrutiny is appropriate when the classifica-

tion involves a fundamental right or a suspect class. *Richardson*, 107 N.M. at 693, 763 P.2d at 1158. As noted in *Richardson*, the tort victim's interest in full recovery of damages is protected only implicitly by the right of access to the courts. 107 N.M. at 692, 763 P.2d at 1157. *Cf. Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (recognizing education as an important interest but not a fundamental right). Moreover, tort victims do not fit the criteria of a "suspect class". *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152–53, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938) (defining suspect class); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (declining to afford suspect class status to mentally retarded persons because "mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions"). We conclude strict scrutiny should not be applied to the damage cap contained in Section 41–4–19(A)(2). A tort victim's interest in full recovery of damages calls instead for a form of scrutiny somewhere between "the largely toothless invocation of minimum rationality and the nearly fatal invocation of strict scrutiny." *Richardson*, 107 N.M. at 697, 763 P.2d at 1162 (quoting *L. Tribe*, *supra* § 16–32, at 1601). We hold, therefore, that intermediate scrutiny should be applied in this case.

■ *Article II, Section 4 does not require application of strict scrutiny.* Trujillo and amicus curiae NMTLA argue that, in addition to Article II, Section 18 of the state constitution, a plaintiff's right to full recovery of tort damages is protected under Article II, Section 4, which provides:

All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness.

We do not believe this provision provides additional support to Trujillo. We find somewhat nebulous any connection that may exist between it and the damage cap contained in Section 41–4–19(A)(2). Even were we to assume that the damage cap implicates the constitutional provisions of Article II, Section 4, here we do not believe these provisions afford more protection to victims of governmental torts than do the provisions of Article II, Section 18.

■ *Existence of alternative means of achieving governmental goal is material to determination of whether classification is substantially related to important governmental interest; issue of constitutionality not fully litigated below.* Under the rational basis test, the opponent of the legislative classification has the burden to demonstrate that the law at issue treats like-situated persons unequally on the basis of a classification scheme unrelated to some real distinction, or that the legislation lacks a reasonable relationship to a legitimate governmental purpose. *Richardson*, 107 N.M. at 695, 763 P.2d at 1160. When, by contrast, the opponent of a statute has established that the validity of the statute is to be tested under heightened scrutiny, it is the party maintaining the statute's validity who "must prove that the classification is substantially related to an important governmental interest." *Id.*

Here, we are inclined to take it as self-evident that "preservation of the public treasury" constitutes an important governmental interest. *See, e.g., Smith v. City of Philadelphia*, 512 Pa. 129, 139, 516 A.2d 306, 311 (1986), *appeal dismissed*, 479 U.S. 1074, 107 S.Ct. 1265, 94 L.Ed.2d 127 (1987). However, a determination that the classification is aimed at furthering an important governmental interest does not necessarily imply that the classification is "substantially related" to the interest so identified. *See Jones*, 97 Idaho at 871–74, 555 P.2d at 411–14 (record demonstrated neither the existence of a medical malpractice insurance crisis nor the relationship between the legislatively created limit on tort damages and any abatement of alleged crisis); *Sibley*, 477 So.2d at 1109 (proponent of legislative classification must demonstrate that it substantially furthers legitimate governmental interest); *Arneson*, 270 N.W.2d at

136 (evidence at trial supported trial court's finding that medical malpractice cap was not related to any real cost crisis in obtaining malpractice insurance); *Condemarin,* 775 P.2d at 363, 369, 373 (with each justice writing separately, a majority held that proponents of damage cap on malpractice actions against government-run hospitals failed to demonstrate that statute had a substantial effect on protecting state treasury). Relying on *City of Philadelphia,* the court of appeals in this case concluded that such a substantial relationship existed because placing a cap on damages necessarily limited the impact of large jury awards on public funds. We do not believe sufficient facts are known from which the court reasonably could reach this conclusion. Accordingly, we reverse the court of appeals.

*—Requirement of a substantial relationship and the existence of less restrictive alternatives.* Trujillo and NMTLA contend the damage cap is unconstitutional because it burdens *only* the constitutionally protected interests of those who have suffered catastrophic injuries and who, therefore, are in greatest need of compensation. The damage cap, they contend, thus impermissibly relies on the most discriminatory means to achieve the legislative ends, while other, less burdensome means exist that equally would further the legislative purpose.

The City and Risk Management argue that, under intermediate scrutiny, the state has no burden to show that less restrictive alternatives would not serve its purpose as well as the means chosen, so long as the means chosen do materially advance this purpose. They contend the court of appeals was correct in its determination that the legislative classification substantially

furthered the government's important purpose since large individual awards in excess of present municipal insurance policies would have a devastating, destabilizing impact on government finances. Moreover, Risk Management argues, "[e]ach dollar protected under the tort claims limit is a dollar's worth of preservation of governmental funds."

We do not agree entirely with either formulation of the requirement that a "substantial relationship" exist between the government's classification scheme and its declared purpose. Trujillo and NMTLA suggest the required fit between means and ends under intermediate scrutiny is the same as the required fit under strict scrutiny; the City and Risk Management suggest the fit need be no tighter than that required under the test of minimum rationality. Intermediate scrutiny, while allowing for a more flexible accommodation of legislative purposes than strict scrutiny, does not abandon totally the concern with over- and under-inclusiveness that, under strict scrutiny, is given form as the least restrictive alternative test.[5]

"[A]n insistence on assessing the importance of the state interest by balancing it against the burdens imposed on the individual and on society ... seems a hallmark of a new form of heightened scrutiny." L. Tribe, *supra* § 16–32, at 1602; *see, e.g., Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (state's interest in preserving limited educational funds for legal residents did not justify statute's burden on the interests of children of illegal aliens). An indirect means by which courts may assess this balance is to determine whether alternatives exist that would not burden protected interests as heavily as the classification scheme chosen. *See, e.g., Ca-*

---

5. For example, in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the Supreme Court applied intermediate scrutiny to invalidate legislation that banned the sale of 3.2% beer to males under twenty-one, but allowed sale of such beer to females over eighteen. The Court rejected the argument that the statute bore a substantial relationship to the government's important purpose in promoting public safety because "the [statistical] showing offered by the appellees does not satisfy us that sex

represents a legitimate, *accurate* proxy for the regulation of drinking and driving." 429 U.S. at 204, 97 S.Ct. at 460 (emphasis added). *Craig* does not control our development of intermediate scrutiny under the New Mexico Constitution. Nonetheless, *Craig* is informative and cannot be reconciled with the notion that, under intermediate scrutiny, a classification only need further to some extent the important governmental interest being pursued.

*ban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see generally* L. Tribe, *supra* § 16–32, at 1603.

Indeed, perhaps the most objective method by which a court may assess the balance struck by the legislature consists in determining the extent to which the government's goals might be advanced by means that burden protected interests less than the means chosen. Such a method eschews reliance on subjective notions of the importance of particular individual interests versus the importance of particular governmental purposes. While the "least restrictive alternative" need not be selected if it poses serious practical difficulties in implementation, the existence of "less restrictive alternatives" is material to the determination of whether the classification substantially furthers an important governmental interest.[6]

*—Facts were not developed sufficiently to allow a determination of substantial relationship between classification and important governmental interest.* Given the nature of the substantial relationship requirement as applied to the issues in this case, we do not believe a reviewing court should content itself merely with anecdotal or speculative showings of a fit between means and ends. *See Schlieter v. Carlos,* 108 N.M. 507, 510, 775 P.2d 709, 712 (1989) (per curiam) (declining to accept certification by federal district court of equal protection challenge to damage cap in Medical Malpractice Act when facts had not been developed at trial to show whether damage cap was substantially related to important governmental interest); *see also Sibley,* 477 So.2d at 1109 (proponent of constitu-

tionality of statute discriminating between tort victims on the basis of their physical condition was obliged to produce evidence to establish that classification at issue substantially furthered a legitimate state interest); *Jones,* 97 Idaho at 871–74, 555 P.2d at 411–14 (remanding for full development of record as to any real health care industry crisis to which a cap on medical malpractice recoveries may bear a fair and substantial relationship).

Here, the individual damage cap in the Tort Claims Act discriminates between tort victims, first, on the basis of the identity of the tortfeasor and, second, on the basis of the amount of damages. On the basis of this classification, the legislature chose to burden the interests of only those individual tort victims whose injuries are caused by a governmental tortfeasor and whose damages exceed $300,000 for all claims.[7] *Cf. Richardson,* 107 N.M. at 698, 763 P.2d at 1163 (on classifications created by damage cap under the dram shop act).

It may appear obvious that the victims of governmental torts who suffer catastrophic injury place the greatest drain on the treasury *individually,* and that the damage cap therefore is substantially related to the goal of protecting governmental funds for other services. However, this obvious proposition does not establish whether large damage awards to such individuals would create a real problem for entities of state government, or *the extent of that problem.* Nor does this proposition establish the effect on the state treasury of *the claims of this class of tort victims in the aggregate,* as compared to the aggregated claims of those with individual claims of $300,000 or less. These latter questions

---

6. As noted in footnote 4 of this opinion, legislative provision for a quid pro quo to plaintiffs in the form of an adequate substitute remedy may affect the balancing process described in *Richardson* and developed further in the body of this opinion. To the extent the proponent of the legislative classification shows that an adequate substitute remedy has been provided to tort victims affected by a legislatively enacted damage cap, it becomes doubtful whether less restrictive alternatives exist that would further the legislative goal as well or better than the means chosen.

7. One additional level of classification would be applicable to discussion of the aggregate damage cap contained in Section 41–4–19(A)(3), as it provides for further limits on damages recoverable by multiple victims of governmental torts whose injuries stem from the same "occurrence." An analysis of the constitutionality of that Section therefore may present considerations not addressed in this opinion.

must be answered if we are to determine whether the individual damage cap substantially advances the state's chosen goal.[8] While it may be that in other cases this Court can assess whether a substantial nexus exists between legislative means and ends without the benefit of such an evidentiary record, here the government's putative goal inextricably is tied to the risk of large damage awards. The existence, nature, and magnitude of this risk, as well as the justification for the means chosen to deal with it, ultimately depend on empirical data.

Risk Management presents statistics to show that, assuming insurance policies providing $300,000 coverage for single occurrences, many municipalities in this state currently lack the resources to satisfy the $247,906 judgment awarded in this case in excess of the $300,000 limit. However, no evidence properly has been developed to show that greater insurance coverage is unavailable, or to show the likelihood that juries will award damages in excess of insurance policies which, practically speaking, these municipalities could obtain, or to show whether other risk spreading mechanisms exist to protect municipalities from large awards. Moreover, since, unlike some states, New Mexico has not created separate statutes for municipalities as opposed to other entities of state government, any determination that the damage cap is constitutional as applied to municipalities would not necessarily amount to a determination that the same cap is constitutional as applied to such other entities. *See City of Cleburne,* 473 U.S. at 447–50, 105 S.Ct. at 3258–59 (zoning ordinance unconstitutional as applied). At most, Risk Management's argument constitutes a justification for giving some form of prospective application to any final determination that the damage cap at issue in this case is unconstitutional. *Cf. Hicks v. State,* 88 N.M. 588, 593–94, 544 P.2d 1153, 1158–59 (1975) (decision abolishing sovereign immunity to be applied prospectively); *Norris v. Saueressig,* 104 N.M. 85, 717 P.2d 61 (Ct.App. 1985) (prospective application of rule declaring military benefits to be community property), *aff'd,* 104 N.M. 76, 717 P.2d 52 (1986).

Here, the district court made its ruling on the assumption that the statute was subject to rational basis review prior to our decisions in *Richardson* and *Schlieter.* The City then did not have notice that it bore the burden to present evidence in support of the constitutionality of the statute, nor does it appear that it was given an opportunity to do so. As did the Supreme Court of Louisiana under similar circumstances, we decline to "penalize the defendant for its failure to anticipate our interpretation" of the requirement of proof it bears in this case. *Sibley,* 477 So.2d at 1109. *See generally Montoya v. Ortiz,* 24 N.M. 616, 175 P. 335 (1918) (appellate court vested with broad discretion to remand case for a new trial or other proceedings,

---

**8.** Although we do not attempt to catalog all the variables that may affect the closeness in fit between the state's chosen means and ends, we give the following examples to demonstrate the impossibility of judging this question in the abstract. It is statistically possible, for instance, that the number of persons with damage claims in excess of $300,000 is so small relative to the class of persons with damage claims less than or equal to $300,000 that the state treasury would be better protected by allowing only those persons with claims over the present liability cap to recover, by limiting all persons with claims against the state to recovery of a certain percentage of their incurred damages, or by some other means. Wisconsin's health care liability statute, for example, apparently does not place an absolute cap on recoverable damages. *See State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 511, 261 N.W.2d 434, 443 (1978). Instead, it limits to $500,000 the amount a victim may collect from judgments in excess of $1,000,000 per year, with a further $500,000 cap on recovery that is triggered only if the legislatively created compensation fund should fall below a certain level. This latter $500,000 limit does not apply to medical expenses. *Id.* Additionally, as the trial court noted in this case, the fact that the legislature did not provide a mechanism for adjusting the damage cap to account for inflation or other financial variables could mean that, regardless of whether the damage cap was constitutionally sound when passed, it is by now constitutionally infirm. *Cf. Carolene Prods.,* 304 U.S. at 153, 58 S.Ct. at 784 (under rational basis review, the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist).

and such will be ordered when it appears that justice so requires). *Cf. McGrail v. Fields*, 53 N.M. 158, 203 P.2d 1000 (1949) (when trial court's erroneous application of statute of limitations in quiet title action prevented it from reaching question of laches, new trial allowed solely on that issue). We therefore conclude that this case should be remanded to the district court for development of the factual record.

In remanding this case we do not intend, as intimated by the dissent of Justice Montgomery, that the trial court will bind us with ultimate findings of legislative fact relevant to the constitutionality of the individual damage cap contained in Section 41–4–19(A)(2) of the Tort Claims Act. Such legislative facts, as so well described by Justice Montgomery, are determinative of policy questions that affect the common law, statutory construction, and constitutional review. This Court is not bound by the weight or determinative character assigned legislative facts by the trial court.

Although we do not know what will be forthcoming from competent advocacy before the trial court, the majority of this Court believes that the empirical data relevant to the State of New Mexico more likely will be developed through expert testimony and other evidence in an adversary evidentiary hearing than through "Brandeis briefs" submitted by the parties on appeal. Given the magnitude of the constitutional issue before us today, we believe it unwise to rush to a premature decision. The advocates of constitutionality in cases involving heightened scrutiny should provide this Court with the best evidence available to support or rebut studies, reports, findings, anecdotes, and speculation that might otherwise be available to us.

Moreover, this Court is not limited to consideration of the legislative facts developed at trial, and remand of this case for an evidentiary hearing does not preclude us from making use of the judicial-notice procedure described by Justice Montgomery. Additionally, if the parties cannot provide the appropriate foundation of legislative facts either at trial or on appeal, we may choose to limit our decision to the case at bar and defer the ultimate resolution of the constitutional question until such a foundation is presented. *See Richardson*, 107 N.M. at 702, 763 P.2d at 1167 (Ransom, J., specially concurring in result, but reserving judgment on ultimate question of statute's constitutionality).

For the foregoing reasons, this case is remanded to the district court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.

WILSON, J. (specially concurring).

MONTGOMERY, J. (concurring in part, dissenting in part).

WILSON, Justice, specially concurring.

I concur that it is appropriate to remand this case to develop additional facts. However, I am not convinced that this is the appropriate time to decide the issue of heightened scrutiny, and like Justice Montgomery, would prefer to leave those doubts for another day.

Further, while I concur that this case involves a single occurrence, in light of my recent dissent in *Folz v. State*, 110 N.M. 457, 797 P.2d 246 (1990), I take exception to the analysis used by the majority in reaching that conclusion.

MONTGOMERY, Justice (concurring in part, dissenting in part).

I join in the Court's opinion and ruling on the single-occurrence issue in this case. I dissent from the disposition of the constitutional issue. Since the Court does not rule on the constitutionality of the statute imposing the damage cap, I will not express a view on that question either. I confess to some skepticism about the Court's linchpin proposition that a tort victim's interest in "full recovery of damages" is entitled to constitutional protection in this state; but it will be time enough to develop a definitive opinion on this issue when, and if, a

majority of the Court actually decides it in a case in which I participate.[1]

I recognize that the proposition was articulated in *Richardson v. Carnegie Library Restaurant,* as a predicate for applying heightened scrutiny analysis to the dram-shop liability limitation in that case. In light of the Court's opinions in the case, however, it is difficult to understand why heightened scrutiny was necessary. Under the reasoning in the plurality and dissenting opinions not even minimal scrutiny would have saved the statute. For the plurality, Justice Walters was "unable to discern or discover" any "legitimate or substantial reason" for limiting the liability of a tavernkeeper. 107 N.M. at 699, 763 P.2d at 1164. The only justification offered in Justice Stowers' dissent was that the statute avoided "overburdening" tavernkeepers. *Id.* at 704, 763 P.2d at 1169. The plurality, in other words, was unable to find *any* public purpose in the statute; the dissent offered only protection of a certain class of tortfeasors, without any explanation of why or how that purpose satisfied even a rational-basis test.

Both the plurality opinion in *Richardson* and the majority opinion in this case anchor a victim's interest in full recovery in the constitutional right of access to the courts. *See id.* at 692, 696, 763 P.2d at 1157, 1161. As recognized by the majority here, however, some state constitutional provisions that the courts shall be open to every person, that a speedy remedy shall be afforded for every injury, and that no person shall be deprived of full legal redress have been construed as mandating only that the courts shall provide equal access to causes of action and remedies established by the courts or the legislature, not that the legislature's power to limit causes of action is

constricted. *See, e.g., Meech v. Hillhaven West, Inc.,* 238 Mont. 21, 37–42, 776 P.2d 488, 498–500 (1989). The majority embraces a more expansive view of the right of equal access to the courts, apparently holding (though never explicitly saying) that the right of access entails also a right to some unspecified amount of money— "full recovery"—and that our state Constitution limits the power of the legislature to place restrictions on this expanded right.

Neither the plurality opinion in *Richardson* nor the majority opinion here ever explains why our Constitution should be construed as affording an injured person a right to any monetary recovery, much less "full" recovery.[2] *Richardson* and the Court here merely posit that there is some sort of right in the Constitution, emanating from or related to the right of equal access to the courts—which I certainly agree *is* fundamental and unquestionably present in several clauses of our Constitution—entitling an aggrieved party to remuneration and constraining the power of the legislature to limit or qualify it.

The majority notes that the power of our state legislature is confined by the Constitution and that the courts, as guardians of the Constitution, have the authority and responsibility to determine when and to what extent legislation has exceeded the bounds imposed by it. But the question before us does not turn on any such elementary principle; it rather depends on whether we read the Constitution as extending to certain litigants a "substantial and important" (*Richardson,* 107 N.M. at 698, 763 P.2d at 1163) right to full recovery. Along with the majority, I believe that no specific right to recovery, no cause of action, no entitlement to monetary redress is "so important" that it must be

---

1. The majority says near the end of its opinion that if and when this case returns to us after development of a fuller evidentiary record on remand, decision of the constitutional issue may be limited to the case at bar and "ultimate resolution" of that issue deferred to another case. To a considerable extent, therefore, the majority's pronouncements in its opinion in this case represent *obiter dicta.*

2. Contrary to the majority's intimation, *Richardson* did not trace a right of full recovery to the due process and equal protection clauses of our Constitution or to the constitutional rights to jury trial and equal access to the courts; it merely described how an *amicus curiae,* the Trial Lawyers Association, had made this argument, purporting to found it on our Constitution's antecedents in Spanish and Mexican law and the Kearney Code. *See* 107 N.M. at 691, 763 P.2d at 1156.

"elevate[d] ... to the level of a fundamental right[,]" as it would be if it were found, expressly or impliedly, in the Constitution.[3] The questions of how much money an individual receives, and from whom he or she receives it and under what circumstances, are for the legislature (and, when it has not acted, the courts through common-law adjudication) to prescribe in regulating the economic affairs of our society.

I thus am highly dubious over the basic predicate to the majority's entire heightened scrutiny analysis in this case. However, as I say, I prefer to leave those doubts for another day. For present purposes I am concerned that the Court has ducked the constitutional issue and sent it back to the district court for a trial on whether the legislature properly devised the legislation at issue to accomplish its purpose.

The majority says that sufficient facts were not developed at trial from which the court of appeals could conclude that the statutory damage cap is substantially related to the admittedly important governmental interest in preserving the public treasury. I am at a loss to know what "facts," within the abilities of the parties to this lawsuit to prove, are supposed to be established on remand. Presumably those "facts" will relate to the impact on municipalities' treasuries (and perhaps the treasury of the state at large) from large damage awards. Perhaps they will also relate to the ability of municipalities to obtain liability insurance with certain dollar limits and the variable cost of such insurance at greater and lesser limits. The majority suggests that the parties should provide evidence on whether large damage awards to individuals who suffer catastrophic injury do in fact create problems for governmental entities, what the extent of those problems may be, and what the effects of large damage claims may be in the aggregate, as compared to an aggregation of smaller claims. Similarly, evidence is to be adduced, or may be adduced, on the effects of inflation and whether or not some adjusting mechanism in the statute could have been implemented.

In my view, the existence of these and similar fact questions does not provide us with an adequate excuse to avoid deciding the constitutional question on this appeal. While development of the kind of record desired by the majority may always or usually be proper to facilitate constitutional adjudication of the sort involved here, I do not believe that we should suggest that it is required to enable us to fulfill our responsibility. We should decide the case on the basis of such facts as are available to us from the record, from parties' briefs (including the voluminous and able briefs of the several *amici* ), and from such other sources, including our own experience, as may occur to us. To remand for a trial— even a trial before a district judge, as opposed to a jury of six or twelve laypersons—is to prolong the course of litigation unnecessarily, to tax the parties' resources unfairly, and to ask for a record on facts which may or may not have been considered by the legislature when it adopted the statute and in any case may not enable any member of this Court to come to a more confident decision than any of us might reach without such supra-legislative scrutiny.

It seems to me that the majority is asking for development of a record containing legislative facts, as that term has been developed by Professor Kenneth Culp Davis and as it is otherwise used in the literature. *See, e.g.,* G. Currie, *Appellate Court Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation,* 1960 Wis.L.Rev. 39, K. Davis, *Judicial Notice,* 55 Colum.L.Rev. 951 (1955); C. McCormick, *Judicial Notice,* 5 Vand.L.Rev. 296 (1952).

---

**3.** The majority states that the right to recover monetary damages is one aspect of the right to petition for redress of grievances, citing *Richardson,* 107 N.M. at 696, 763 P.2d at 1161. Of course, while *Richardson* did declare the right to full recovery to be a right entitled to constitutional protection—a declaration with which I disagree—the opinion in that case links the right to petition for redress of grievances to the right of equal access to the courts, *not* to the putative right to recover monetary damages.

When a court or an agency finds facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts so determined are conveniently called adjudicative facts. When a court or an agency develops law or policy, it is acting legislatively; the courts have created the common law through judicial legislation, and the facts which inform the tribunal's legislative judgment are called legislative facts.

Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses. Legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take.

.    .    .    .    .

The exceedingly practical difference between legislative and adjudicative facts is that, apart from facts properly noticed, the tribunal's findings of adjudicative facts must be supported by evidence, but findings or assumptions of legislative facts need not, frequently are not, and sometimes cannot be supported by evidence.

K. Davis, *supra*, 55 Colum.L.Rev. at 952–53.

Assuming that we do have need for additional "legislative facts" to decide this appeal, the next question is: How are such facts to be established? Professor McCormick quotes from *United States v. Carolene Products Co.*, 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938):

"Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194 [55 S.Ct. 187, 79 L.Ed. 281 (1934)], and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist. *Chastleton Corp. v. Sinclair*, 264 U.S. 543 [44 S.Ct. 405, 68 L.Ed. 841 (1924)]."

C. McCormick, *supra*, 5 Vand.L.Rev. at 316. He goes on to say:

The usual resort, however, for ascertainment of legislative facts is not through formal proof by sworn witnesses and authenticated documents but by the process of judicial notice. Is judicial notice here trammeled by the usual requirement that the facts noticed must be certain and indisputable? Such a requirement seems inappropriate here where the facts are often generalized and statistical and where their use is more nearly argumentative, or as a help to value-judgments, than conclusive or demonstrative.

*Id.*

This position—that legislative facts, in order to be judicially noticed, need not be certain and indisputable—is reflected in the comments of the Advisory Committee for the Federal Rules of Evidence concerning Fed.R.Evid. 201.

The Advisory Committee ... embraced the general rule that legislative facts need not be developed through evidentiary hearings. Rule 201 of the Federal Rules of Evidence governs judicial notice of adjudicative facts. No evidentiary rule refers to judicial notice of legislative facts because, as the Advisory Committee noted, "any limitation in the form of indisputability, any formal requirements of notice other than those already inherent in affording opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level" are inappropriate to judicial access to legislative facts. Fed.R.Evid. 201 note.

*Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1163 n. 24 (D.C.Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 113 (1980). The District of Columbia Circuit Court of Appeals goes

on to point out that courts consistently have considered legislative facts that were not the product of trial-type proceedings, citing as examples *Muller v. Oregon,* 208 U.S. 412, 421–22, 28 S.Ct. 324, 326–27, 52 L.Ed. 551 (1908) (in which Louis D. Brandeis filed one of his famous briefs); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973); *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973).

Our own rule of evidence on judicial notice, SCRA 1986, 11–201, taken from the federal rule, also applies only to judicial notice of adjudicative facts.

It would seem, then, that this Court—or any court, trial or appellate—may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to establish those facts. Of course, when a trial court takes notice of such facts, it should insure that they are made part of the record so that their ascertainment and effect can be reviewed on appeal. Similarly, if an appellate court judicially notices certain legislative facts as supporting a particular ruling—whether of constitutional law, statutory interpretation or common-law adjudication—the facts so noticed should probably be set out in the opinion, so that the bar and the public may likewise evaluate the correctness of and the implications flowing from those facts.

It would be inappropriate, however, for a trial court to "find" the legislative facts leading to a ruling on a question of law. Unlike the operative facts affecting the particular parties in the particular circumstances of a particular lawsuit—the adjudicative facts—the legislative facts relevant to a question of law cannot be binding on an appellate court and must always be open to redetermination and reevaluation.

It is considerations like these that lead me to the conclusion that remand for an evidentiary hearing on the "facts" relating to the "fit" between legislative classification and legislative purpose in this case is inappropriate. The trial court cannot find the facts and foreclose this Court from finding different facts. The trial court's evaluation of the import of whatever facts it takes notice of may be quite different from the one adopted by an appellate court on review.

Then there are other, but similar, practical considerations. On remand, who will have the burden of proof? There are several indications in the majority opinion that, despite the presumption of constitutionality that usually attaches to legislation, the City will have the burden both to produce evidence and to persuade the trial court that the missing "facts" are as it, as proponent of the legislation, claims them to be. What facts must the City prove? It must prove—I assume, but am not sure—that there is a substantial relationship between the legislative purpose of conserving public funds (so that they may be allocated among competing demands for public resources and so that taxes may be kept low) and the means chosen to effectuate this purpose (the limitation on recovery). What if the City does not carry its burden? What if the evidence is evenly balanced, so that the City fails to persuade the fact-finder that there is the required substantial relationship? Then not only will the City lose this particular lawsuit; the statute will be declared unconstitutional and the damage limitation—for the City of Albuquerque, for all other municipalities in the state, and for the state itself—presumably will fall.

It is one thing to place the burden of persuasion upon a party to a lawsuit when the effect of not carrying that burden will be limited to the outcome of the particular lawsuit. It is quite another to make the constitutionality of legislation depend upon whether a single party does or does not carry his, her or its burden of proof in that suit.

Why should the constitutionality of legislation depend upon how well a party performs the evidence-producing function in a particular case? If the issue is the constitutionality of a statute *as applied* to the particular parties in the particular circumstances, it may well make sense for the outcome to depend on proof of specific facts as to how the statute operates in the

specific circumstances. Where the issue is not limited to the statute's validity or invalidity as applied, there is far too much at stake to leave the question in the hands of the parties to a given lawsuit.

Suppose the parties lack the resources to provide the requisite demonstration, through evidence, of the fit between ends and means? The parties may not only lack the resources and the ability to adduce the relevant evidence; what resources they have may be dissipated or significantly diluted through the Court's requirement that they go back to trial and prove the imponderables with which they are now saddled. Part of the damage award to Mr. Trujillo will now be used up in proving that the legislature was not sufficiently careful in devising alternative means for accomplishing its admittedly important public purpose. When the occurrences and other specific facts surrounding a dispute must be proved to the satisfaction of the fact-finder, it is appropriate to make one or the other of the disputants carry the burden of establishing or disproving those facts at the risk of losing; but when the validity of a legislative enactment of general application, based on facts and value judgments quite outside the details of a particular dispute, depends on what those parties can prove, the court in which the dispute is tried becomes a mini-, and in some ways a super-, legislature.

This dispute has been in court since 1985. The parties are entitled to an answer. They should not be sent back to the trial court for more discovery, investigation of the reasons why the legislature might or might not have acted as it did, a trial on that question, and another inevitable appeal. If, in order to decide *this* appeal, we feel that we need additional information, we should ask the parties to supplement their briefs and provide it to us. We should not defer the question; it is the kind of question this Court and appellate courts all over the country answer every day.