766 P.2d 305

STATE of New Mexico, ex rel. The Honorable Benjamin Anthony CHAVEZ and the Honorable Petra Jimenez Maes, Petitioners,

v.

The Honorable Rebecca VIGIL–GIRON, Secretary of State, the Honorable Tony Scarborough, Chief Justice of the Supreme Court, the Honorable Thomas A. Donnelly, Chief Judge of the Court of Appeals, the Honorable Garrey Carruthers, Governor, the Honorable Raymond Sanchez, Speaker of the House of Representatives, and the Honorable Manny Aragon, President Pro Tempore of the Senate, Respondents.

No. 18091.

Supreme Court of New Mexico.

Dec. 22, 1988.

Hannett, Hannett & Cornish, P.A., George Foster Hannett, and John W. Higgins, Albuquerque, for petitioners.

Hal Stratton, Atty. Gen., G.T.S. Khalsa, Asst. Atty. Gen., Santa Fe, Rodey, Dickason, Sloan, Akin & Robb, P.A., and Richard C. Minzner, Albuquerque, for respondents.

Freedman, Boyd & Daniels, P.A., Charles W. Daniels, Albuquerque, Rothstein, Bennett, Daly, Donatelli & Hughes, Robert W. Rothstein, Santa Fe, Ray Twohig, P.C., Ray Twohig, Albuquerque, Rodey, Dickason, Sloan, Akin & Robb, P.A., Bruce D. Hall, Joel K. Jacobsen, Charles K. Purcell, and Jack P. Eastham, Albuquerque, for amici curiae.

## OPINION

RANSOM, Justice.

Petitioners, a judge-elect of the court of appeals and a district court judge, seek a writ of mandamus directed against various state officials charged with the implementation of constitutional amendment 6, which was approved by the voters of the state on November 8, 1988. The petition alleges that the amendment was adopted unconstitutionally because it contained a number of independent proposals which should have been presented to the voters as separate amendments under Article XIX, Section 1 of the New Mexico Constitution. The petition further alleges that the legislature acted without authority when it adopted the resolution placing the amendment on the ballot in an even-numbered year. Petitioners allege this was in violation of the "regular session" provisions of Article XIX, Sections 1 and 5, and Article IV, Section 5 of the Constitution.

Several individuals and private organizations moved to intervene and respond to the petition as real parties in interest. They included the Honorable W. John Brennan, Rebecca Sue Sitterly, Joseph E. Caldwell, district court judges, Mr. Joe Jolly, People for Judicial Reform, the League of Women Voters of New Mexico, the New Mexico Council on Crime and Delinquency, and Common Cause. They were heard as friends of the Court.

The amendment was entitled "Proposing to Amend Articles 6 and 20 of the Constitution of New Mexico to Provide for Judicial Reform." By joint resolution, the legislature voted in February 1988 to present the proposed amendment to the voters. Prior to the November election, the amendment was debated widely by members of the state judiciary, the state bar, and concerned voters. The chief justice, the senior justice, and two associate justices of this Court recused themselves from considering the petition filed in this case to avoid the appearance of any impropriety in hearing a question of constitutionality after they had taken a public stand on the merits of the amendment during the pre-election debate. Pursuant to Article VI, Section 6 of the Constitution, four senior district court judges were called in to act as justices of the Court.

We recognize the question of the constitutionality of this amendment to be one of great public importance and interest, see *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975 (1974), and, no objection having been raised or argued as to the propriety of the parties or the jurisdiction of this Court, we proceed to the merits of the issues before us.

**The amendment.** The amendment contains a method other than by partisan election to select and retain justices of the supreme court and judges of the court of appeals, district courts and metropolitan courts (§§ 7 and 9–13); an increase in the minimum age and years of legal practice required to be a justice or judge (§§ 2 and 4); provisions that the chief justice of the supreme court be selected as provided by law and that the presiding judges in each judicial district and metropolitan court be selected by their peers (§§ 1 and 14); an increase in the minimum number of court of appeals judges from three to seven (§ 8); and legislative authority to redraw annually (rather than every ten years) the boundaries of judicial districts, to increase the

number of judicial districts, and to provide for additional judges in those districts (§ 5). The provision for selection of the chief justice replaced provisions that no justice appointed or elected to fill a vacancy shall be chief justice and replaced a formula provision for succession to the office of chief justice when not otherwise provided for by law. The replaced section had provided that the initial supreme court consist of three justices, and the new section provides for at least five justices in conformity with Article VI, Section 10, which empowers the legislature to increase the number of justices to five.

■ *Multiplicity of amendments.* Article XIX, Section 1 of the Constitution provides in part that "[i]f two or more amendments are proposed, they shall be so submitted as to enable the electors to vote on each of them separately." At least thirty-two other states have or have had similar provisions in their state constitutions. *City of Raton v. Sproule,* 78 N.M. 138, 143, 429 P.2d 336, 341 (1967). As recognized by consensus at oral argument in this case, the purpose of such provisions is to prevent "logrolling," a legislative practice of joining together two or more independent measures so those who support any one measure will feel obliged to vote for the others in order to secure passage of the measure they favor. *Id.* at 144, 429 P.2d at 342; *Kerby v. Luhrs,* 44 Ariz. 208, 36 P.2d 549 (1934); *State ex rel. Pike County v. Gordon,* 268 Mo. 321, 188 S.W. 88 (1916). However, it is also widely recognized that, as the branch of government empowered to initiate constitutional amendments, the legislature should be afforded substantial deference to determine both the overall object of a proposed amendment and the changes "incidental to and necessarily connected with the object intended." *Barnhart v. Herseth,* 88 S.D. 503, 511, 222 N.W.2d 131, 135 (1974) (quoting *State ex rel. Adams v. Herried,* 10 S.D. 109, 121, 72 N.W. 93, 97 (1897)); *see also Sproule,* 78 N.M. at 144, 429 P.2d at 342; *Keenan v. Price,* 68 Idaho 423, 447–48, 195 P.2d 662, 676 (1948) (quoting *State ex rel. Hudd v Timme,* 54 Wis. 318, 335–37, 11 N.W. 785, 790 (1882)); *Hillman v. Stockett,* 183 Md. 641, 652–53, 39

A.2d 803, 808 (1944); *cf. Renck v. Superior Court,* 66 Ariz. 320, 326, 187 P.2d 656, 660 (1947). Accordingly, this Court held in *Sproule* that, as with legislative enactments, every presumption is to be indulged in favor of the validity and regularity of a constitutional amendment, 78 N.M. at 142, 429 P.2d at 340, and we must therefore hesitate to overturn a legislative determination that a proposal actually constitutes but one amendment. *Id.* at 144, 429 P.2d at 342.

■ It was also acknowledged at oral argument, as this Court recognized in *Sproule,* that: (1) the issue of whether logrolling or joinder of multiple amendments indeed has taken place is not a political question but is rather a justiciable constitutional question, notwithstanding the absence of any challenge to the constitutionality until after the voters have approved the amendment; and (2) the standard of review to be applied is the reasonable or rational basis test utilized in most jurisdictions. Whether using the terms "reasonable" or "rational" basis, "beyond a reasonable doubt," or "clear violation," the authorities are in general agreement as to the standard of review to be applied. " '[T]he question presented is, not whether it is possible to condemn, but whether it is possible to uphold [the amendment]. . . .' " *Sproule,* 78 N.M. at 142, 429 P.2d at 340; (quoting *State ex rel. Kemp v. City of Baton Rouge,* 215 La. 315, 325, 40 So.2d 477, 480 (1949)); *see also Kahalekai v. Doi,* 60 Haw. 324, 331, 590 P.2d 543, 549 (1979); *Hillman,* 183 Md. at 653, 39 A.2d at 808; *Barnhart,* 88 S.D. at 512, 222 N.W.2d at 136.

Petitioners argue that in this case more than one amendment was involved because two articles and many sections of the Constitution were affected by the proposed changes. Petitioners also argue that it is inappropriate to presume the validity of an amendment when it is challenged for containing multiple objects. In such cases, it is argued, this very defect makes it impossible to ensure that the adoption of the proposed changes truly expresses the will of the people.

■ We agree that the joinder of two or more amendments is no mere irregularity, and that the constitutional prohibition against joinder goes to the heart of the amendment process mandated by the people in the adoption of their Constitution, a process which itself may be amended only by constitutional convention. N.M. Const. art. XIX, §§ 1, 5. Nonetheless, while *Sproule* recognized that the number of articles and sections affected by an amendment is not entirely immaterial, 78 N.M. at 145, 429 P.2d at 343, the main inquiry in cases such as this is not how the present Constitution, which stands to be amended, organizes its subject matter. Rather, the question to be answered is whether the legislature reasonably could have determined that a proposed amendment embraces but one object.

In rejecting the second argument put forth by the petitioners, the Court in *Sproule* stated:

> The fact that two points of change are involved, the fact that either might have been presented ... separately, and the fact that there may be reasons why an elector might have desired one change, and not the other, are not in themselves sufficient to hold the adoption of the amendment invalid.

*Id.* As the Supreme Court of Hawaii noted:

> [It is] incumbent upon members of the public to educate and familiarize themselves with the contents and effect of ... proposed amendments before expressing themselves at the polls.... This [is] a non-delegable responsibility which [is] magnified, rather than diminished, by [the complexity of] amendments presented to them.... [W]here information placed before the electorate is neither deceptive nor misleading, and they are given sufficient time within which to familiarize themselves with the contents and effect of proposed amendments, they will be deemed to have cast informed ballots.

*Kahalekai v. Doi,* 60 Haw. at 339–40, 590 P.2d at 553 (1979) (citations omitted). *See Sproule,* 78 N.M. at 142, 429 P.2d at 340 (presumption of validity strengthened by approval of the qualified voters of the state at a regularly-called election).

■ Petitioners argue that when two or more changes could be adopted without in any way being controlled, modified or qualified by the other, they must be presented separately, quoting *McBee v. Brady,* 15 Idaho 761, 779, 100 P. 97, 103 (1909). *Cf. Kerby v. Luhrs,* 44 Ariz. 208, 221, 36 P.2d 549, 554 (1934). We decline to adopt any such mechanical rule. While petitioners argue that the *McBee* test can and should be applied rationally to avoid the joinder of clearly independent amendments, not mechanically to dissect to absurdity an amendment with a single object or purpose, we believe it comports better with the doctrine of separation of powers to decide what rationally may be joined rather than what rationally may be separated.

When, as here, the passage or rejection of one or more of the parts of an amendment may well have no effect on the operation of the whole, the "rational" application of the *McBee* test urged by petitioners invites subjective evaluation of the legislative determination by the courts. The separation of powers doctrine, however, dictates that strong deference should be shown to the legislature. This strong deference is the very premise on which an objective rational basis test rests. Yes, the framers did intend that when distinct changes to the Constitution are not dependent on each other, and there is no direct, necessary, or logical connection between the operation of each, they should be submitted separately to the voters; but the legislature must be deemed to appreciate this intent no less than we.

In aid of the application of the reasonable or rational basis test, we look to the opinions of other jurisdictions. In *Hillman,* 183 Md. at 650–51, 39 A.2d at 807, a Maryland court was asked to invalidate an amendment very similar in topic and scope to the one before us today. In analyzing the problem before it, the court noted that the legislature was empowered in the first instance to determine what changes it

deemed advisable and to put these changes in one bill, and wrote:

> We cannot assume that the Legislature would propose an amendment, which might contain matters obviously not related, but if it did, then the Courts would have the power to pass upon the proposal and to determine whether or not [the Constitution] had been followed. In the absence of a clear violation, the judgment of the Legislature ... should be respected, and the Courts should not interfere.

*Id.* at 653, 39 A.2d at 808. *Cf. Barnhart*, 88 S.D. at 504–509, 222 N.W.2d at 132–134 (sweeping change made to entire executive branch).

■ In the present case, the changes proposed are germane to an overarching theme of "judicial reform." We cannot ignore the rational linchpin that joins the qualifications and merit selection of judges, their numbers, their districting, and the selection of their chief administrative officers. Hence, we conclude that amendment 6 does not violate the provisions of Article XIX, Section 1 of the Constitution. If legislative power to redistrict annually can be joined with merit selection of judges, it may be asked whether anything proposed by the legislature which touches upon the judiciary would likewise be germane. In answer, we note that it is not our intention to broaden the limits of constitutional joinder; we are holding that, although perhaps testing the limits of joinder, the provisions in this amendment are not devoid of a reasonable or rational basis of commonality.

*Regular sessions.* Petitioners next argue that the amendment is a nullity because the legislature has no authority to propose constitutional amendments during regular sessions held in even-numbered years. This argument takes two forms, the gist of which are also contained in two opinions by the attorney general issued in 1965 and 1969. *See* Att'y Gen.Ops. No. 65–212 (1965), 69–151 (1969). We note that at oral argument in this case the attorney general has repudiated these earlier opinions.

■ One form of the argument is based on Article IV, Section 5. This section was amended in 1964 to provide for 30-day regular sessions in even-numbered years. From 1911 to 1964 the only regular sessions were 60-day, odd-numbered-year sessions. The 1964 amendment provides that during even-numbered-year regular sessions, unlike odd-numbered-year regular sessions, the matters which the legislature may consider are limited to: (1) budgets, appropriations and revenue bills; (2) bills drawn pursuant to special messages of the governor; and (3) bills of the last regular session vetoed by the governor. N.M. Const. art. IV, § 5(B). Petitioners argue that since the matters which may be considered in an even-numbered-year regular session are specified, and the list does not include constitutional amendments, the legislature may not propose constitutional amendments during regular sessions held in even-numbered years. Petitioners acknowledge that Article XIX, Section 1 provides for the proposal of amendments in "any regular session," but maintain that because the amendment to Article IV, Section 5 was adopted after the provisions of Article XIX, Section 1, it controls over the earlier provisions.

This argument fails to take into account the limited scope of Article IV. In *Hutcheson v. Gonzales*, 41 N.M. 474, 485–87, 71 P.2d 140, 147–48 (1937), this Court held that when the legislature acts in its law-making capacity, it does so pursuant to Article IV; however, when the legislature acts to propose constitutional amendments to the electorate, it does not act pursuant to its law-making capacity under Article IV, but rather acts pursuant to its capacity as a constitutional "convention" under Article XIX. Therefore, the two articles must be construed as functionally independent. Given the limited scope of Article IV, we conclude the 1964 amendment makes no mention of resolutions proposing constitutional amendments because this subject is not included within the scope of Article IV, not because the framers of the 1964 amendment sought to exclude such resolutions. Moreover, had they sought to ex-

clude such resolutions by amending Article IV, Section 5, their efforts would be without effect. When the legislature acts to put a proposed constitutional amendment before the people, it does so pursuant to Article XIX, not Article IV. Therefore, its authority to consider the subject of constitutional amendments is not affected by the list of legislative topics in Article IV, Section 5(B). For these reasons, petitioners' first argument on this question must fail.

■ Petitioners next argue that the legislature may only consider constitutional amendments in "unlimited" 60–day regular sessions under Article XIX, Sections 1 and 5. Section 1 provides that constitutional amendments may be proposed "at any regular session." Section 5 provides that the procedures for amending the Constitution contained in Section 1 may not themselves be changed except through the extraordinary procedure of calling a general constitutional convention under Article XIX, Section 2. Petitioners argue that the term "regular session" must therefore be given the same "meaning" today as it received in 1911, when Article XIX was drafted.

Legislative sessions are classified by the Constitution as "regular," "extraordinary," and "special." N.M.Const. art. IV, §§ 5–6. The legislature, which has the primary responsibility to adhere to constitutional processes in proposing amendments, consistently has interpreted the term "any regular session" to mean "other than a special or extraordinary session." Extraordinary sessions initiated by the legislature were first adopted by amendment in 1948. Provision was made in the 1911 Constitution for special sessions to be initiated by the governor. It has not been argued that the 30–day, even-numbered-year session initiated under the 1964 amendment is either an extraordinary or special session. The argument is that, since there was no even-numbered-year regular session under the 1911 Constitution, the limitation to regular sessions for introduction of amendments could only have been intended to mean either the odd-numbered-year or the unrestricted regular sessions for which provision was then made.

We believe, however, that the purpose and intent of the framers of the Constitution was to limit introduction of amendments to regular as opposed to special sessions, rather than to limit amendments to odd-numbered rather than even-numbered years or to unrestricted rather than restricted regular sessions. It was certainly foreseeable to the framers that the readily amendable provisions defining regular sessions in Article IV would be expanded to include sessions other than 60–day, odd-numbered-year sessions or to include sessions limited in subject matter. On the other hand, the Article XIX amendment process itself cannot be changed except through a general convention. Had the framers intended that the amendment process be limited to 60–day, odd-numbered-year sessions or regular sessions not limited in subject matter, they could have said so quite plainly in Article XIX.

***Conclusion.*** Both the body politic of the United States and the Constitution under which it is organized have proved themselves dynamic in meeting the challenges of changing times. We can expect no more and no less of the people of New Mexico and of their Constitution. With respect to the test of "two or more amendments—separate vote" and with respect to the meaning of "regular session," persuasive arguments have been made and authorities cited in this case in support of both sides. When, as here, competing interpretations or applications of the Constitution's amendment process do not present one singularly clear and plain mandate, it is to the people and their elected representatives that the Court must turn for the dynamic meaning which most comports with the purpose and intent of a Constitution in which the framers recognize that all political power is vested in and derived from a people who have the sole and exclusive right to govern themselves. The petition is denied.

IT IS SO ORDERED.

JOSEPH F. BACA, ROZIER, E. SANCHEZ and JAMES L. BROWN, District Judges, concur.

JOE H. GALVAN, District Judge, specially concurs.

JOE H. GALVAN, District Judge (specially concurring).

I concur in the result and the analysis so ably expressed by Justice Ransom.

However, since the opportunity may never again present itself and for the reason that thoughts and ideas harbored but not expressed become part of the cosmos without contributing to its order, I feel compelled to add the following. Needless to say, these observations are not in any way to be construed as a statement of policy or opinion of the Court, the Justices of the Court, or the District Judges sitting on the Court for this case. This is merely the opinion of the writer as a District Judge who by happenstance was selected to sit on this case and whose humble opinion is that extending an olive branch is always conducive to mutual understanding.

Beyond cavil is the proposition that this case will have a far-reaching impact on the constitutional jurisprudence of this State. It is therefore appropriate for this Court to discuss the interrelationship among the "three equal and co-ordinate branches" of government. *Renck v. Superior Court*, 66 Ariz. 320, 326, 187 P.2d 656, 660 (1947).

The salutary scheme of "checks and balances" does not contemplate a constant or recurring tension among the departments in accomplishing their constitutional mandate. It does not envision power struggles or one-upmanship. To the contrary, there is a prohibition against any of the departments exercising any powers properly belonging to either of the others, except as provided by the Constitution. N.M.Const. art. III, Section I. Rather, like a well-oiled machine whose disparate parts independently but in harmony with each other accomplish their unified purpose, so the three departments together strive for one goal—good government.

This Court does not intend to create law, but to interpret it; and in a spirit of solidarity invites the legislative branch to create the law but leave to the courts to say what the law is. Finally, I respectfully enjoin the executive branch in implementing the law to accord to its sister branches the deference and respect to which they are entitled. For government functions at its best when the three branches of government, while not in any way abrogating their constitutional prerogatives, operate on the basis of mutual respect and self-imposed restraint.

As we rapidly approach the unimagined wonders of the twenty-first century, all public servants should be ever cognizant of the unalterable fact that a strong and independent judiciary, a conscientious and concerned legislature, and an efficient and effective executive make for what our Constitution represents—good government.

The people of the State of New Mexico deserve, nay, demand nothing less.