# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2015-NMSC-001

Filing Date: December 4, 2014

Docket No. 34,646

STATE OF NEW MEXICO, ex rel.,
HON. CARLOS R. CISNEROS, and
HON. GEORGE K. MUNOZ,
As members of the New Mexico Legislature
and Citizens of New Mexico,
HON. ALAN M. MALOTT,
HON. J.C. ROBINSON,
HON. JEFF FOSTER MCELROY, and
HON. LOUIS P. MCDONALD,
As New Mexico State District Court Judges
and Citizens of New Mexico,
THE DISTRICT JUDGES ASSOCIATION
OF NEW MEXICO, INC., a/k/a The District and
Metropolitan Judges Association of New Mexico,
HON. DUANE K. CASTLEBERRY,
HON. DAVID JOEL GARNETT,
HON. KAREN P. MITCHELL, and
HON. WARREN WALTON,
As New Mexico Magistrate Court Judges and
Citizens of the State of New Mexico,
and THE NEW MEXICO MAGISTRATE
JUDGES ASSOCIATION,

       Petitioners,

v.

HON. SUSANA MARTINEZ,
Governor of the State of New Mexico, and
HON. DIANNA J. DURAN,
Secretary of State of New Mexico,

       Respondents.

ORIGINAL PROCEEDING

1

The Vargas Law Firm, L.L.C.
Ray M. Vargas, II
Albuquerque, NM

for Petitioners

Jessica Hernandez
Matthew J. Stackpole
Jeremiah L. Ritchie
Santa Fe, NM

for Respondent Hon. Susana Martinez

Gary K. King, Attorney General
Scott Fuqua, Assistant Attorney General
Santa Fe, NM

for Respondent Dianna J. Duran

## OPINION

**PER CURIAM.**

**{1}**     In the waning hours of the 2014 legislative session, the Legislature passed the General Appropriations Act of 2014, 2014 N.M. Laws, ch. 63, §§ 1-14 (Appropriations Act), which included a pair of salary increases for judges and justices of the New Mexico state judiciary (collectively, judges). The first increase, funded in Section 4(B) of the Appropriations Act, was a 5% raise, the appropriation for which was lumped in with various other appropriations to the judicial branch to pay the salaries of all judicial employees, including judges. *See* 2014 N.M. Laws, ch. 63, § 4(B) (appropriating, for example, $7,049,600 to the First Judicial District Court for "[p]ersonal services and employee benefits," which included funds for a 5% judicial pay increase for the judges of that district). The 5% raise was not separately identified in the language of Section 4(B).

**{2}**     The second increase, separately funded in Section 8(A) of the Appropriations Act, was the same 3% raise authorized for all eligible state employees, including judges. *See id.* § 8(A). Section 8(A)(2) in particular allocated $579,937 to fund the 3% raise for judges and increased the salary of a Supreme Court Justice to $134,922, a sum that included both the 5% and the 3% raises.

**{3}**     Calling out what she referred to as a "dramatic 8% raise," Governor Martinez used her partial veto authority to strike the following language from Section 8(A) before signing the Appropriations Act into law:

> Section [8(A)] . . . The salary increases shall be effective the first full

2

pay period after July 1, 2014, and distributed as follows:

. . .

(2) five hundred seventy-nine thousand nine hundred thirty-seven dollars ($579,937) to provide the justices of the supreme court a salary increase to one hundred thirty-four thousand nine hundred twenty-two dollars ($134,922) and to provide the chief justice of the supreme court, the chief judge of the court of appeals, and judges of the court of appeals, district courts, metropolitan courts and magistrate courts a salary increase pursuant to the provisions of Section 34-1-9 NMSA 1978;

*Id.* § 8(A)(2). Significantly, the Governor did *not* veto any of the appropriation language or dollar amounts set forth in Section 4(B) which included the funds for a 5% raise.

**{4}** Thereafter, a group of judges, judicial associations, and legislators (collectively, Petitioners) petitioned this Court under Article VI, Section 3 of the New Mexico Constitution to issue a writ of mandamus to the Governor and Secretary of State Duran to declare the Governor's veto of Section 8(A)(2) unconstitutional. *See* N.M. Const. art. VI, § 3 ("The supreme court shall have original jurisdiction in . . . mandamus against all state officers, boards and commissions . . . ."). Petitioners also asked this Court to order the Governor and the Secretary of State to reinstate Section 8(A)(2) and to implement the full 8% raise passed by the Legislature, or alternatively to implement the 5% raise separately funded in Section 4(B).

**{5}** Citing a possible appearance of impropriety or bias about ruling on the issues raised in the petition, the Chief Justice, the Senior Justice, and two Associate Justices of this Court recused themselves from this proceeding. *See* Order, *State ex rel. Cisneros v. Martinez*, No. 34,646 (N.M. Sup. Ct. Apr. 16, 2014) (designating Justice Richard C. Bosson as Chief Justice under the rule of necessity for the purpose of appointing justices *pro tempore* and presiding over this petition); *see also Pierce v. State*, 1996-NMSC-001, ¶ 5, 121 N.M. 212, 910 P.2d 288 (recognizing the rule of necessity articulated by the United States Supreme Court that sometimes requires members of a jurisdiction's highest tribunal, as a matter of duty and necessity, to sit and not recuse). In their place, a quartet of retired jurists, consisting of a former Chief Justice, two former Chief Judges of the Court of Appeals, and a former Chief Judge of the First Judicial District Court, agreed to serve as justices *pro tempore* for this proceeding. *Accord State ex rel. Chavez v. Vigil-Giron*, 1988-NMSC-103, ¶ 3, 108 N.M. 45, 766 P.2d 305 (explaining that four district judges were appointed as justices *pro tempore* after the chief justice, senior justice, and two associate justices recused themselves from appellate review of constitutional reforms to the manner of selecting and retaining future state judges, including members of the Supreme Court).

**{6}** After ordering full briefing and hearing the arguments of the parties, the Court denied the petition in part, ruling from the bench that the Governor's veto was effective with respect

to the 3% raise set forth in Section 8(A)(2). The Court also granted the petition in part, ruling that the 5% raise separately funded in Section 4(B) of the Appropriations Act was never vetoed and therefore survived intact. We issued a writ of mandamus consistent with our ruling and ordered the Secretary of the Department of Finance and Administration (DFA) to implement the 5% raise.[1] We now issue this opinion to set forth our reasoning in more detail.

**BACKGROUND**

**{7}** As we will explain more fully in this opinion, Petitioners maintain that the Governor's veto of Section 8(A)(2), which we upheld, had no effect on the 5% raise included in Section 4(B). In response, the Governor challenges the legality of the Legislature's method of appropriating funds for the 5% pay raise in Section 4(B), separate from Section 8(A)(2) and without any language that specifically identified the 5% raise. We therefore inquire whether any source of law prohibits the Legislature from using an appropriation like that set forth in Section 4(B)—which included funds for a pay raise but without an explicit mention of a raise—to establish a judicial salary that includes a salary increase. This is a matter of first impression, and we thus begin with a brief overview of the various methods the Legislature has used in the past to establish judicial salaries and pay raises.

**Historical Approaches To Establishing Judicial Salaries**

**{8}** Until 1953, judicial salaries were set forth in the New Mexico Constitution. *See* N.M. Const. art. VI, § 11 (as amended through 1952) (providing that the annual salary of a Supreme Court Justice shall be $6,000); *id.* art. VI, § 17 (as amended through 1952) (providing that the annual salary of a district court judge shall be $4,500). As a result, salaries could be changed only by amending the Constitution; that is, through a formal proposal and vote in the Legislature followed by a popular election. *See* N.M. Const. art. XIX, § 1.

**{9}** In 1953, a pair of constitutional amendments removed the specific judicial salary figures from the Constitution and permitted the Legislature to "fix" or "provide" judicial salaries "by law." *See* N.M. Const. art. VI, § 11 ("The justices of the supreme court shall each receive such salary as may hereafter be fixed by law."); *id.* art. VI, § 17 ("The legislature shall provide by law for the compensation of the judges of the district court."). Two years later, the Governor signed two statutes into law that set forth the annual salaries of justices and district court judges. *See* NMSA 1953, § 16-2-1.1 (1955) (providing that a Supreme Court Justice shall receive an annual salary of $15,000); *id.* § 16-3-33.1 (1955) (providing that a district court judge shall receive an annual salary of $12,500); *see also id.* § 16-7-3 (1966) (providing that a court of appeals judge shall receive an annual salary of

___

[1]We joined the DFA Secretary as a party to the order for the purpose of implementing our ruling.

4

$18,500). For roughly the next 40 years, judicial salaries could be changed only by formally amending the relevant statutes; that is, by passing a bill through both chambers of the Legislature and presenting it to the Governor for signature. *See* N.M. Const. art. IV, § 22.

**{10}** In 1993, the Legislature repealed the statutes that had been used to "fix" or "provide" judicial salaries "by law" and replaced them with NMSA 1978, Section 34-1-9 (1993, amended 2007), which the Governor signed and which remains in effect to this day. *See* 1993 N.M. Laws, ch. 278, § 1 (repealing NMSA 1978, Sections 34-2-2, 34-5-3, and 34-6-3 (1990)). Section 34-1-9 simply provides that Supreme Court Justices shall receive an annual salary that "shall be established by the legislature in an appropriations act." Section 34-1-9 also sets forth a formula for calculating the salaries of the Chief Justice and all other judges and magistrates, using a Justice's salary as the baseline. For example, the Chief Justice's annual salary "is two thousand dollars ($2,000) more than the annual salary of a justice of the supreme court," § 34-1-9(A); the annual salary of a judge of the court of appeals "is ninety-five percent of the annual salary of a justice of the supreme court," § 34-1-9(D)(1); a district judge's salary "is ninety-five percent of the annual salary of a judge of the court of appeals," § 34-1-9(D)(2); and so on.

**{11}** Requiring judicial salaries to be established "by the legislature in an appropriations act" appears to have had at least two important consequences. First, it has simplified the process of establishing judicial salaries by eliminating the need for substantive legislation that must be separately signed by the Governor, and instead allowing judicial salaries to be included within the legislative budget process. *See, e.g.*, NMSA 1978, § 2-5-4(C) (1967) ("Each state agency, department and institution shall furnish to the legislative finance committee a copy of its appropriation request made to the department of finance and administration at the same time such request is made to such department."). Second, it has required judicial salaries to be established annually because an appropriations act, by design, expires or sunsets at the end of a fiscal year. *See, e.g.*, 2014 N.M. Laws, ch. 63, § 3(C), (E) (providing that the amounts set forth in Section 4 of the General Appropriations Act of 2014 are appropriated "for expenditure in fiscal year 2015" and that any unexpended balances at the end of the fiscal year shall revert to the general fund). And like any other general appropriations act, an appropriation for judicial salaries is subject to a valid exercise of the Governor's partial-veto authority. *See* N.M. Const. art. IV, § 22 ("The governor may . . . disapprove any part or parts, item or items, of any bill appropriating money."). We discuss the Governor's partial-veto authority in more detail later in this opinion. Unless properly vetoed, however, judicial salaries including pay raises become law as part of the appropriations process.

**Legislative Approaches To Establishing Judicial Salaries Under Section 34-1-9**

**{12}** Since Section 34-1-9 was enacted in 1993, the Legislature has used three principal methods for establishing judicial salaries. Two of the methods have been used when the Legislature sought to increase judicial salaries. The third method has been used when salaries were to remain unchanged from the previous year's levels.

5

**{13}** The first method appeared in the General Appropriations Act of 1994, in which the Legislature sought to give judges a 3% raise. *See* 1994 N.M. Laws, ch. 6; *see also* 1995 N.M. Laws, ch. 30. That year, the Legislature funded judicial salaries, including the 3% raise, in Section 4(B) through the general appropriations to the appellate courts and judicial districts to pay the salaries of all employees of each court or judicial district. *See* 1994 N.M. Laws, ch. 6, § 4(B); *see also* 1995 N.M. Laws, ch. 30, § 4(B). Like the 2014 appropriations we are examining in Section 4(B), these were lump-sum appropriations that did not include a separate item for the salaries of particular employees or classes of employees. For example, the 1994 appropriation to the Supreme Court for employee salaries simply provided:

**SUPREME COURT:**

| Item | General Fund | Total |
|---|---|---|
| (a) Personal services | [$1,249,400] | [$1,249,400] |
| (b) Employee benefits | [$348,700] | [$348,700] |

1994 N.M. Laws, ch. 6, § 4(B). The Legislature explained in a separate section of the 1994 Act that the appropriations in Section 4(B) included funds for a 3% pay increase for all judicial employees, including judges, and it set forth the prior salary and the new salary of a Supreme Court Justice. *See* 1994 N.M. Laws, ch. 6, § 3(L)(c) ("[J]ustices of the supreme court shall receive a three percent salary and benefit increase, from [$77,250] to [$79,567] . . . ."); *see also* 1995 N.M. Laws, ch. 30, § 3(N)(3) ("[J]ustices of the supreme court shall receive a three percent salary and benefit increase, from [$79,567] to [$81,954] . . . .").

**{14}** Since 1997, the Legislature has preferred a second method for establishing judicial salaries that included a pay increase, electing to fund only existing salaries along with the general appropriations to the judiciary in Section 4(B), and funding any raise through a separate appropriation to the DFA, a part of the executive branch, in another section of the act much like the present Section 8(A)(2). *Compare, e.g.*, 1997 N.M. Laws, ch. 33, § 4(B) (appropriating funds to the judicial branch for "[p]ersonal services" and "[e]mployee benefits"), *with id.* § 9 (appropriating funds to the DFA to provide a 2% raise to all eligible state employees) (vetoed). Under this approach, the Legislature's appropriation to the DFA specifically provided that judges would receive the raise, either by identifying a percentage increase or by stating the new salary. *Compare, e.g.*, 1997 N.M. Laws, ch. 33, § 9(C)(2) (providing that judges and justices shall receive a 2% raise) (vetoed), *with, e.g.*, 1999 N.M. Laws, 1st Spec. Sess., ch. 3, § 8(A)(1) (providing a salary increase to $87,773).

**{15}** The third method of establishing judicial salaries has arisen by implication in years when judges did not receive a salary increase. In those years, the appropriations acts were silent about judicial salaries, with no language that specifically mentioned judicial pay. Only the dollar figures set forth in the general appropriations to the judiciary in Section 4(B) showed by mathematical inference the Legislature's intent to establish judicial salaries at the previous years' levels. *See, e.g.*, 2009 N.M. Laws, ch. 124, § 4(B) (appropriating, for

example, $2,797,300 to the Supreme Court for "[p]ersonal services and employee benefits"); 2010 N.M. Laws, 2d Sess., ch. 6, § 4(B) (appropriating, for example, $2,813,100 to the Supreme Court for "[p]ersonal services and employee benefits"); 2011 N.M. Laws, ch. 179, § 4(B) (appropriating, for example, $2,711,400 to the Supreme Court for "[p]ersonal services and employee benefits"); 2012 N.M. Laws, ch. 19, § 4(B) (appropriating, for example, $2,777,000 to the Supreme Court for "[p]ersonal services and employee benefits").

**{16}** A comparison of these three methods reveals a notable difference about the recipient of the appropriations for judicial salaries. In years when the Legislature used the first or third method, it appropriated the entire amount for judicial salaries to the judicial branch. In years when it used the second method, however, the Legislature appropriated funds for existing salaries to the judicial branch, and it appropriated funds for the raise to the executive branch, to be distributed by the DFA. The Legislature has never provided an explanation for the different recipients or the different methods of providing judicial salaries and raises.

**{17}** All three methods also share important similarities. First, under each method the appropriations in Section 4(B) have always been lump-sum appropriations without item-by-item language, and as such Section 4(B) has never included a separate line or item for judicial salaries, even in years when it included funds for a judicial salary increase. Instead, the money appropriated in Section 4(B) for judicial salaries has been an inseparable, unspecified portion of a larger appropriation to a court or judicial district. And second, when the Legislature has sought to increase judicial salaries, it has expressly identified the raise elsewhere in the appropriations act, apart from the general appropriations for judicial employee salaries in Section 4(B).

### The 2014 Approach—A Hybrid Method

**{18}** In 2014, the Legislature tried something different, a hybrid of sorts. Borrowing from the first method described above, the Legislature appropriated funds for existing judicial salaries in Section 4(B), plus sufficient funds for a 5% pay raise through the general appropriations to the judicial branch. And borrowing from the second method, the Legislature in Section 8(A) separately appropriated funds for a 3% raise through an appropriation to the DFA. *See* 2014 N.M. Laws, ch. 63, § 8(A) ("Nineteen million seven hundred ninety-one thousand six hundred dollars ($19,791,600) is appropriated from the general fund to the department of finance and administration for expenditure in fiscal year 2015 to provide salary increases of three percent to employees in budgeted positions who have completed their probationary period subject to satisfactory job performance.").

**{19}** As part of the appropriation for the 3% raise, the Legislature directed the DFA to distribute $579,937 of the appropriation "to provide the justices of the supreme court a salary increase to . . . $134,922," and to provide the Chief Justice and other judges and magistrates with a salary increase under Section 34-1-9. *See id.* § 8(A)(2). The parties agree that the $134,922 salary in Section 8(A)(2) did not match the 3% raise funded in that same provision; it was $9,994 more than the previous year's salary of $124,928 and represented a total

increase of 8%. *Compare id.* § 8(A)(2) (increasing the salary of a Supreme Court Justice to $134,922), *with* 2013 N.M. Laws, ch. 227, § 8(A)(2) (increasing the salary of a Supreme Court Justice to $124,928).

**{20}** We pause to emphasize a critical point. In this writ proceeding, there is no serious dispute that the appropriations for personal services and employee benefits in Section 4(B) did, in fact, include funds for the 5% raise, though the funds were not specifically identified as such. Indeed, Petitioners appended to their reply brief several documents purporting to prove that the 5% raise was part of the Section 4(B) appropriations, including an affidavit from Senator George Munoz, a party to this proceeding and an LFC member, testifying that Section 4(B) included funds for a 5% raise. Senator Munoz's affidavit included two attachments in support of his testimony: a pre-session recommendation by the Legislative Finance Committee (LFC) to appropriate funds in the Appropriations Act to provide a 5% pay increase to justices and judges; and a post-session LFC report explaining that Section 4(B) included funds for a 5% judicial pay raise. Similarly, the Governor appended an affidavit from the Director of the State Budget Division of the DFA explaining certain elements of the budgetary process and acknowledging that Section 4(B), "contains more funding than is necessary to fund judges' salaries at the fiscal year 2014 level." The Director states that this additional funding can be used for other expenses or revert to the general fund, but he never contradicts the premise that the additional funds were intended to provide a 5% raise to judges or that they can be used for that purpose. No party objected to or moved to strike any of these exhibits.

**{21}** While none of these documents is talismanic, we consider them insofar as they support the obvious conclusion: the Legislature's unusual, two-phased approach to funding judicial salaries was a matter of common knowledge. Everyone involved in the budgetary process seems to have understood that the Legislature gave judges two raises: the same 3% raise in Section 8(A)(2) provided to all qualified state employees, and a separate 5% raise in Section 4(B), commingled with the appropriations for the salaries of all judicial employees and publicized in key legislative documents. *See, e.g.*, LFC FY2015 Budget Recommendations, *available at* http://www.nmlegis.gov/lcs/lfc/lfcdocs/budget/ 2015RecommendVolII.pdf, at 14 ("[T]he courts requested an additional [$617,000] to provide all judges a 5 percent compensation increase . . . . The [LFC] recommendation provides adequate funding for . . . a 5 percent compensation increase for judges . . . .").[2]

---

[2]The LFC also noted that its recommendation

took into account the findings of the legislatively created Judicial Compensation Commission which recommended increasing judicial salaries by 11 percent to bring New Mexico judge salaries in line with those in Oklahoma. The 5 percent salary increase requested would increase a district judge's salary from $113 thousand to $119 thousand. The commission found that New Mexico's district court judges are the lowest paid in the country.

**{22}**     Recognizing that the new salary figure set forth in Section 8(A)(2) was the sum of both the 5% and 3% raises, the Governor vetoed that provision in its entirety, explaining:

> I have vetoed the compensation increases for . . . elected judges throughout the state.
>
> . . .
>
> [T]hough I would have supported a more modest 3% increase in pay for judges that would have put them on par with other pay raises in the budget, I cannot support the dramatic 8% raise requested in the budget.

Senate Executive Message No. 112 (Mar. 11, 2014), *available at* http://governor.state.nm.us/uploads/FileLinks/8c4df00e709649488058c836188fb9d5/SEM112_1.pdf. Based on her explanation, it seems clear that the Governor believed that her veto of Section 8(A)(2) eliminated both raises. We now turn to that question: whether the Governor's veto was effective in regard to either section of the Appropriations Act.

**DISCUSSION**

**{23}**     On previous occasions when this Court has been called upon to consider the proper exercise of the Governor's partial veto authority, we have tried to articulate a set of guiding principles, rooted in the idea that the partial veto power is "a negative power, or a power to delete or destroy a part or item, and . . . not a positive power, or a power to alter, enlarge or increase the effect of the remaining parts or items." *State ex rel. Sego v. Kirkpatrick*, 1974-NMSC-059, ¶ 18, 86 N.M. 359, 524 P.2d 975. Thus, a partial veto must "destroy[] the whole of an item or part [without] distort[ing] the legislative intent." *Id.*; *see also State ex rel. Smith v. Martinez*, 2011-NMSC-043, ¶ 8, 150 N.M. 703, 265 P.3d 1276 ("Our case law emphasizes the limitation of the Governor's partial veto power by requiring that the veto eliminate the *whole* of an item or part and prohibiting the striking of individual words that result in legislation inconsistent with the Legislature's intent."). These broad principles provide only the starting point of our analysis; ultimately, each situation has come down to the particular facts of a particular appropriation and a particular veto. *See, e.g.*, *Sego*, 1974-NMSC-059, ¶ 11 (separately analyzing the validity of seven vetoes). This case is no less fact bound than those that have come before us in the past.

**{24}**     At oral argument before this Court the Governor took the position that regardless of what the Legislature's original intent may have been to make two separate appropriations, that intention changed or evolved as the Appropriations Act took final form. Relying on the one, lump sum salary figure set forth in Section 8(A)(2), the Governor argued that the

---

LFC FY2015 Budget Recommendations, *supra*, at 14.

Legislature's ultimate intent was to provide a single 8% raise in Section 8(A)(2) which the Governor duly vetoed. This argument is not without a certain logic because, as we have indicated, that lump sum salary figure ($134,922) is the total sum of both appropriations.

**{25}** But we do not find the Legislature's intent so easy to discern from Section 8(A)(2). The unexplained mismatch in that provision between the funds allocated for the 3% raise and the salary that represented an 8% raise—a mismatch the Governor recognized—renders the meaning of Section 8(A)(2) unclear. At the very least, the mismatch signaled that Section 8(A)(2) was not the only portion of the Appropriations Act that concerned a judicial pay increase.

When legislative language is "unclear, ambiguous, or reasonably subject to multiple interpretations," we look to other indicators of legislative intent, including "the history, background, and overall structure of the statute." *See State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183. Based on the Appropriations Act's structure, we are convinced that the Legislature intended two raises. To conclude otherwise would require us to overlook the Legislature's own choice to fund these raises through two separate appropriations, contained in two separate sections of the Appropriations Act, and made to two separate branches of government—5% to the Judiciary and 3% to the DFA. Under these circumstances, we are persuaded that the Legislature intended two separate raises and provided appropriations for them in two separate sections of the Appropriations Act, one of which the Governor vetoed, the other of which remained intact.

**{26}** The salary figure set forth in Section 8(A)(2) does not compel a different conclusion. Rather than showing that the Legislature intended to provide a single 8% raise, we view the salary as signaling the Legislature's unusual approach to establishing judicial salaries in the Appropriations Act. The salary on its face is more than the 3% raise appropriated in Section 8(A), indicating that the Legislature had appropriated a separate 5% raise for judges elsewhere in the Act—not in Section 8(A)(2)—which the parties knew to be Section 4(B). Having concluded that the Legislature intended two separate raises, we now consider the veto's effect on each raise in turn.

**The Veto Eliminated the 3% Raise**

**{27}** The veto's effect on the 3% raise strikes us as a fairly easy question. The parties do not dispute that the Legislature intended the money allocated in Section 8(A)(2) to fund the same 3% raise for judges that was given to other state employees in Section 8(A). Nor do they dispute that the Governor's veto removed from the Appropriations Act every trace of the 3% raise for judges by eliminating all language related to the 3% raise, the entire allocation for the 3% raise, and the salary that included the raise. Everything related to the 3% raise for judges was confined to Section 8(A)(2), which the Governor vetoed in its entirety. Our case law requires nothing more. *See, e.g.*, *State ex rel. Dickson v. Saiz*, 1957-NMSC-010, ¶ 28, 62 N.M. 227, 308 P.2d 205 ("It mattered not where in the bill they rested if they constituted an integral part of the subject being partially vetoed—out they came!").

10

The veto "destroy[ed] the whole" of the 3% raise for judges and therefore was an effective exercise of the Governor's partial veto authority.

**The Veto Did Not Eliminate the 5% Raise**

**{28}** The closer question is whether the veto of Section 8(A)(2) had any effect on the 5% raise funded in Section 4(B). Petitioners contend that even if the veto of the 3% raise was effective, the 5% raise was unaffected because the Governor did not veto the appropriations in Section 4(B) that included funds to pay for the 5% raise. In a series of related arguments, the Governor counters that because her veto of Section 8(A)(2) eliminated the Appropriations Act's only explicit mention of a judicial pay increase ("to provide the chief justice [and other judges] a salary increase pursuant to the provisions of Section 34-1-9"), her veto simply left salaries intact at the previous year's levels. In other words, the Governor takes the position that her veto of Section 8(A)(2) reached beyond the 3% raise funded in that provision and also eliminated the 5% raise funded in Section 4(B). We now turn to a more detailed examination of the Governor's arguments.

*The Legislature's historical practice, though informative, does not necessarily control how the Legislature may choose to act in a different legislative session*

**{29}** The Governor relies heavily on years when the general appropriations acts were silent about judicial pay to argue that her veto of Section 8(A)(2) eliminated the 5% raise in Section 4(B). She contends that the vetoed Appropriations Act "looks identical to the general appropriations acts in dozens of other years . . . when the legislature has simply omitted any authorization of new judicial salaries" and judges continued to be paid at the previous year's salary levels. By contrast, in years when the Legislature has sought to give judges a raise, the Legislature has explicitly identified the raise in a separate provision of the appropriations act. The Governor therefore maintains that judges must continue to be paid at their 2014 salary levels. Like previous years when judges did not receive a raise, her veto left no language in the Appropriations Act to explicitly "authorize" a raise, whether 3%, 5%, or both.

**{30}** Petitioners respond that nothing in the law requires the Legislature to "authorize" a raise in the manner the Governor prescribes. Rather, the New Mexico Constitution and Section 34-1-9 require only that judicial salaries be "fixed," "provided," or "established" by the Legislature in an appropriations act, without specifying where or how in the act the Legislature must do so or what language or detail the Legislature must employ to establish judicial salaries. Petitioners also point to years when the appropriations acts were silent about judicial salaries as evidence that the Legislature may "establish" judicial salaries with a mere appropriation. In this instance, Petitioners have the more accurate argument.

**{31}** As previously explained, under Section 34-1-9 judicial salaries must annually be "established by the Legislature in an appropriations act" because appropriations acts expire or sunset after a year. Thus, in those years when the appropriations acts did not explicitly

11

reference judicial pay, the general appropriations to the judiciary in Section 4(B), which included unspecified amounts to fund judicial salaries, were sufficient to "establish" judicial salaries as required by statute.[3] As was true this year, it was understood in those years that the Legislature had appropriated funds to pay judges at a particular level, even without specific language in the act to provide a base figure for the formula in Section 34-1-9.

**{32}** And while in recent years it may have been the Legislature's historical practice—and perhaps even the better practice—to explicitly identify a judicial salary increase separately from Section 4(B), we have found nothing in the law that *requires* the Legislature to do so. We are unable to find support for the Governor's contention to the contrary. No constitutional or statutory provision limits how the Legislature may choose to establish judicial salaries, including pay raises, as long as they are "established by the legislature in an appropriations act." Section 34-1-9 (E). The details for establishing judicial salaries—like many parts of the appropriations process—appear to be entrusted to the discretion of the Legislature. The Constitution requires only that every law "making an appropriation" shall "specify" the "sum appropriated" and the "object to which it is to be applied." N.M. Const. art IV, § 30. No party challenges the 5% pay raise under Article IV, Section 30. Absent any such limitation clearly imposed on a co-equal branch of government, whether by constitution or statute, principles of judicial restraint and respect for the constitutional separation of powers dictate that we not invent one. *See* N.M. Const. art. III, § 1 ("The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others . . . .").

---

[3]The evolution of Section 34-1-9 supports this view. From its enactment in 1993 until it was amended in 2004, Section 34-1-9(A) provided, "Justices of the supreme court shall each receive an annual salary of seventy-seven thousand two hundred fifty dollars ($77,250)." The statute also provided, "For [fiscal year 1995] and all subsequent fiscal years, the annual salary for justices of the supreme court . . . shall be established by the legislature in an appropriations act." Between 1993 and 2004, the annual salaries of judges were increased at least four times, including in 2000, when the annual salary of a Supreme Court Justice was increased to $90,407. *See* 2000 N.M. Laws, 2d. Sess., ch. 5, § 10. But the following two years, the appropriations acts were silent about judicial salaries. In 2001, the Governor vetoed the appropriations to the DFA for compensation increases for all state employees, leaving only the general appropriations for existing salaries in Section 4, *see* 2001 N.M. Laws, ch. 64, § 9 (vetoed), and in 2002, the appropriations act did not include any language about judicial salaries, other than the general appropriations in Section 4(B), *see* 2002 N.M. Laws, Extraordinary Sess., ch. 4. In each of those years, judicial salaries seemingly would have reverted to the 1993 level still codified in Section 34-1-9(A), but for the appropriations in Section 4(B) that "established" salaries—with or without language to that effect—at the same level established in the 2000 general appropriations act.

**{33}** More importantly, to treat the vetoed Appropriations Act the same as previous appropriations acts—when legislative silence about judicial salaries maintained the status quo—would be to ignore a critical difference. Even after the veto, this year's appropriations in Section 4(B) still included money for a raise, when the prior years' appropriations did not. To ignore this distinction would be to turn a blind eye to the obvious—to treat the appropriation for the 5% raise as though it were hidden in plain sight. We decline to do so. The appropriations in Section 4(B) were sufficient to "establish" judicial salaries, including a 5% raise. More to the point, nothing in the law dictates that the Legislature could not establish judicial salaries in that fashion.

### To veto the 5% raise, the Governor had to veto the appropriations in Section 4(B)

**{34}** In support of a related argument, the Governor cites our recent opinion in *Stewart* to argue that the money appropriated in Section 4(B) to fund the 5% raise cannot be used for its intended purpose because her veto eliminated all of the "language" in the Appropriations Act related to a judicial salary increase. *See Stewart*, 2011-NMSC-045, ¶ 15 ("All *language* that relates to the subject to be proscribed by the veto must be vetoed for the veto to be valid." (emphasis added)). The Governor asserts that the judicial entities that received the additional money in Section 4(B) may spend it on any expenses related to personal services or employee benefits—except to increase judicial salaries. She alternatively suggests that the courts may follow the DFA's established procedures for transferring funds between appropriated categories, or may allow the money to revert to the general fund at the end of the fiscal year.

**{35}** The Governor's argument overlooks the distinct facts of this case. The Legislature gave judges a 5% raise through the appropriations in Section 4(B), without any "pay raise language" to veto but the appropriations themselves. Under these circumstances, the general rule articulated in *Stewart* that "[a]ll *language* that relates to the subject to be proscribed by the veto must be vetoed for the veto to be valid" simply does not apply. *See Stewart*, 2011-NMSC-045, ¶ 15 (emphasis added). The Legislature having left no language to veto in Section 4(B), the Governor could not rely on her veto of other language elsewhere in the Act appropriating other money. We do not read *Stewart* so narrowly that it alters the Governor's underlying responsibility when exercising her partial-veto authority: to "destroy[] the whole of an item or part [without] distort[ing] the legislative intent." *Sego*, 1974-NMSC-059, ¶ 18. Consistent with our admonition in *Sego*, the Governor had to veto the "whole" appropriation where the Legislature placed it. The appropriations in Section 4(B) represented the only "language" for the Governor to veto if she disapproved of the 5% raise.

**{36}** Petitioners argue that the Governor's assertion—that the funds for the 5% raise may be spent on anything but a 5% raise—supports their position that they should receive both the 5% and 3% raises passed by the Legislature. Petitioners contend that the veto of Section 8(A)(2), itself, was unconstitutional under *Sego* because it "alter[ed] . . . the effect" of the funds intended for the 5% raise by requiring them to be spent on something other than the raise, effectively "creat[ing] new legislation." *See Sego*, 1974-NMSC-059, ¶ 18 ("The power

13

of partial veto is . . . a negative power, or a power to delete or destroy a part or item, and . . . not a positive power, or a power to alter, enlarge or increase the effect of the remaining parts or items. It is not the power to enact or create new legislation by selective deletions." ). We do not reach this argument because of our determination that the Legislature intended two separate raises. The veto of Section 8(A)(2) had no effect on the 5% raise funded in Section 4(B). The only way to eliminate the 5% raise was to veto the appropriations in Section 4(B) that included the funds for that purpose.

***Including the 5% raise in the Section 4(B) appropriations was not unconstitutional "subtle drafting"***

**{37}** Finally, the Governor contends that, if the veto of Section 8(A)(2) did not also eliminate the 5% raise in Section 4(B), the entire appropriation in Section 4(B) "is improper and should be stricken" due to "careful drafting of legislation" aimed at "circumvent[ing] or preempt[ing] the Governor's veto power." This argument is based on our suggestion in *Sego* that "[t]he Legislature may not properly abridge [the Governor's partial veto] power by subtle drafting of conditions, limitations or restrictions upon appropriations." 1974-NMSC-059, ¶ 12. However, *Sego* did not apply or otherwise develop that language or consider the possible results of "subtle drafting" on a properly exercised partial veto.

**{38}** Not until *State ex rel. Coll v. Carruthers* were we faced with a situation that required us to consider the limitation that we had placed on the Legislature in *Sego*. *See* 1988-NMSC-057, 107 N.M. 439, 759 P.2d 1380. In *Coll*, the petitioners challenged Governor Carruthers' veto of a restriction or condition imposed by the Legislature upon an appropriation that prohibited the Second Judicial District Attorney's Office from spending any of its general appropriation on "rental of parking space." *Id.* ¶ 10. The Court first considered the restriction itself, which the parties agreed would have affected only $4,000 of a $4,500,000 appropriation—less than 0.1% of the appropriation—and held that it violated separation-of-powers principles by intruding on the executive function by "attempt[ing] to make detailed, min[u]scule, inconsequential executive management decisions." *Id.* ¶ 11. The Court then rejected the petitioners' fallback argument that the veto was invalid because it distorted the Legislature's intent in violation of *Sego*:

> The legislature may not artfully draft conditions or restrictions that would force the governor to veto an entire appropriation to a particular agency in order to reach a limitation or condition he finds constitutionally offensive. If this line of reasoning were followed the governor would be left with the option of either vetoing the entire appropriation of $4,500,000 or accepting the restriction. The restriction was not a proper restriction or condition and as such was subject to veto by the governor. The legislature left the governor no reasonable alternative. The veto was valid.

1988-NMSC-057, ¶ 15. *Coll* remains the only instance in which this Court has rejected a challenge to a partial veto based, at least in part, on a refusal to validate "artful drafting" by

14

the Legislature.

**{39}** Upon close examination, we think *Coll* is of little use here. In 2014 the Legislature imposed no condition—minuscule or otherwise—upon its appropriations for judicial pay raises. Sections 8(A)(2) and 4(B) are stand-alone, unconditional, and separate appropriations, and as such must be vetoed in their entirety like any other appropriation of which the Governor disapproves in whole or in part.

**{40}** With respect to Section 4(B) in particular, the Legislature routinely includes funds in general appropriations acts, like the funds for the 5% raise, that are earmarked for certain purposes but that are not identified in separate lines or items; rather, they are combined with other, similarly situated funds sharing a common "object to which [the appropriation] is to be applied." N.M. Const. art IV, § 30. The Governor provides no authority for the proposition that the Legislature must treat funds for judicial raises differently by separating them from the general object of the appropriation—personal services and employee benefits.

**{41}** More importantly, reading *Coll* to prevent the Legislature from acting as it did in this case would lead to absurd results. Nothing in the New Mexico Constitution requires the Legislature to make appropriations easy to veto by identifying each appropriation in a separate line or item in an appropriations act. If that were *Coll*'s holding, general appropriations acts would necessarily become immense. They would be transformed into highly detailed documents that would have to identify the specific object of every dollar appropriated by the Legislature. That was clearly not *Coll*'s intended effect, and the New Mexico Constitution does not require anything like it. *See Coll*, 1988-NMSC-057, ¶ 11 (holding a provision of the 1988 appropriations act unconstitutional because the Legislature had "attempt[ed] to make detailed, min[u]scule, inconsequential executive management decisions" about how the district attorney's office could spend a portion of its base budget).

**{42}** To the extent that the Governor invites us to interpret the notion of "subtle drafting" to fit the circumstances of this case, we are unwilling to do so. The Governor has not provided a limiting principle to distinguish subtle drafting from drafting that is not-so-subtle, and we do not consider it wise to fashion one on our own. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments."). Outside of the facts of *Coll*, in which we refused to allow the Legislature to use *Sego* to shield an unconstitutional restriction from the Governor's veto pen, we remain respectful of constitutional separation of powers and accordingly prefer to allow the legislative process to play out free from judicial interference, so long as the process is open and transparent. *Cf. Martinez v. Jaramillo*, 1974-NMSC-069, ¶ 9, 86 N.M. 506, 525 P.2d 866 ("The mischief to be prevented [by Article IV, Section 16 of the New Mexico Constitution] was hodge-podge or log-rolling legislation, surprise or fraud on the legislature, or not fairly apprising the people of the subjects of legislation so that they would have no opportunity to be heard on the subject.").

### The appropriations process offers the best solution

**{43}** In truth, the appropriations process is largely unregulated; our constitution has left it that way for over one hundred years. As we explained forty years ago in *Sego*,

> The legislative power of the State of New Mexico is vested in the Legislature. Except for interest or other payments on the public debt, money shall be paid out of the treasury of the State only upon appropriations made by the Legislature, and every law making an appropriation shall distinctly specify the sum appropriated and the object to which it is to be applied. The supreme executive power of the State is vested in the Governor, whose principal function, insofar as legislatively enacted law is concerned, is to faithfully execute these laws. [She] does, however, have the power to exercise veto control over the enactments of the Legislature to the extent that this power or authority is vested in [her] by Art. IV, § 22, supra. As to bills appropriating money, [she] clearly has the power to veto a "part or parts" or "item or items" thereof.

1974-NMSC-059, ¶ 12 (internal citations omitted).

**{44}** The New Mexico Constitution also provides the political and logistical framework within which the appropriations process takes place. The Legislature is tasked with passing a general appropriations act each year and with submitting it to the Governor for approval. *See* N.M. Const. art. IV, § 22. The Governor may, and often does, participate in and influence the legislative process as the bill takes shape. *See, e.g.*, NMSA 1978, § 6-3-21(A) (2004) ("The governor shall prepare the budget and submit it to the legislative finance committee and each member of the legislature not later than January 5 in even-numbered years and not later than January 10 in odd-numbered years."). Direct, oftentimes frank discussions may take place. If a particular appropriation amounts to a "deal breaker" for the Governor, the Legislature then has to weigh the value of that particular appropriation against the likelihood of a gubernatorial veto and even the possibility of a special session. This is all part of the give and take of any legislative session, and it is where the competing interests of those two co-equal branches of state government are best played out.

**{45}** But with a few exceptions that are not relevant here, *see* N.M. Const. art. IV, § 16, the act's form and substance are left to the Legislature. Once the act is presented to the Governor, her role is a limited one. If an act is presented to her more than three days before the end of a legislative session, she may refuse to sign it, note her objections, and send it back to the Legislature. *See* N.M. Const. art. IV, § 22. In that event, the act cannot become law unless two-thirds of the members of the house and senate vote to override the Governor's objections. *See id.* If the act is presented to the Governor during the last three days of a session, she may refuse to sign it, or she may "disapprove any part or parts, item or items" of the bill and sign the remainder into law. *Id.* In the event that the Governor vetoes the entire appropriations act or an essential portion, she may call the Legislature back

16

for a special session. *See* N.M. Const. art. IV, § 6.

**{46}** Historically, this is a process in which the judicial branch has been reluctant to interfere, a "delicate constitutional balance between the executive and the legislative branches of government." *Coll*, 1988-NMSC-057, ¶ 9 (quoting *Colorado General Assembly v. Lamm*, 704 P.2d 1371, 1377 (Colo. 1985) (en banc)). We will not speculate about the Legislature's motive for choosing this particular method of providing the 5% raise. A clear effect of that choice, however, was to make the raise more challenging for the Governor to veto if she found it objectionable; she had to veto the entire appropriation. We are unable to find any legal basis to conclude that this amounted to legislative overreach, especially when the Governor had notice of the Legislature's intent and when she had other tools in the political process at her disposal. We reiterate that the New Mexico Constitution does not prescribe a particular method that the Legislature must follow when it appropriates funds. Accordingly, the Legislature remains free to use any of the methods that it has used in the past, or to create new ones, provided that the Governor receives sufficient notice to permit her to meaningfully exercise her partial-veto authority. *See* N.M. Const. art. IV, § 22.

**{47}** Finally, we note the unusual context in which this case has arisen; to a great extent it is unlike any of our precedents. To our knowledge, the Legislature's method of appropriating funds to increase judicial salaries was novel, as was the Governor's attempt to eliminate both raises by vetoing only one appropriation and leaving the other intact. With this ruling, we are upholding the valid exercise of the Governor's partial veto authority, while at the same time we uphold the Legislature's broad authority to fashion general appropriations acts in its discretion, absent a specific prohibition in the New Mexico Constitution.

**CONCLUSION**

**{48}** The Governor's veto of Section 8(A)(2) successfully "destroy[ed] the whole" of the 3% judicial pay increase. The veto had no effect on the 5% increase separately funded in Section 4(B).

**{49}    IT IS SO ORDERED.**

 

 

 

———————————————————————

**RICHARD C. BOSSON, Justice,**
**Chief Justice, Sitting by Designation**


———————————————————————

**PATRICIO M. SERNA, Justice,**
**Retired, Sitting by Designation**


———————————————————————

17

**A. JOSEPH ALARID, III, Judge,
Retired, Sitting by Designation**

_____

**CELIA F. CASTILLO, Judge,
Retired, Sitting by Designation**

_____

**JAMES A. HALL, Judge, Retired,
Sitting by Designation**